In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.

Re: CONTINGENT COMPENSATION.

No. 70–347.

United States District Court, E. D. Pennsylvania.

Jan. 26, 1973.

MEMORANDUM AND ORDER
NO. 1087

FULLAM, District Judge.

By virtue of various applications and responses thereto, all of which will be detailed later, the Court is required to make comprehensive rulings governing the status of various retirement programs and related programs of the Debtor. A brief description of the programs in question is set forth below; the actual application of each program to particular employees may vary depending upon hiring date and previous employment history:

Blank, Rome, Klaus & Comisky, by Marvin Comisky, and Robert P. Lipkin, Philadelphia, Pa., for trustees, PCTC.

Drinker, Biddle & Reath, by Rush T. Haines, II, Philadelphia, Pa., for Chase Manhattan Bank.

Jack B. Justice, Philadelphia, Pa., for Girard Trust Bank.

Jacob I. Goodstein, by B. W. Mehlman, New York City, for Allen J. Greenough.

Labrum & Doak, by Edward C. German and Joseph G. Manta, Philadelphia, Pa., for David Bevan.

Fox, Rothschild, O'Brien & Frankel, by Nochem S. Winnet, Philadelphia, Pa., for First Nat. City Bank of N. Y.

Dechert, Price & Rhoads, by Matthew J. Broderick, Philadelphia, Pa., for Penn Cent. Co.

Bader & Bader, by I. Walton Bader, New York City, for Penn Cent. Bondholders Protective Committee.

Litvin & Rutter, by Thomas B. Rutter, Philadelphia, Pa., for Alfred E. Perlman.

Montgomery, McCracken, Walker & Rhoads, by Joseph W. Swain, Jr., Philadelphia, Pa., for James M. Symes.

Takiff, Bolger & Murphy, by Harry A. Takiff, Philadelphia, Pa., for Stuart T. Saunders.

Mann & Unger, by Theodore R. Mann, Philadelphia, Pa., for Kohout, Smucker, Tackbary, Carpi, Cousins, Ewalt, Fair, Henry, Jones, Marine, Morris, Nancarrow, Newell, Patchell, Pevler, Schroeder, Smith, Symes, Roberts, Cranwell and Prizer.

Tate & Erwin, by W. Bourne Ruthrauff, and Spencer Ervin, Jr., Philadelphia, Pa., for Richard Joyce Smith, trustee, New York, New Haven & Hartford R. R.

1. *Retirement Programs.* The retirement programs detailed below are designed to complement and supplement employee benefits under the Railroad Retirement Act, 45 U.S.C. § 228a et seq., and for the most part are applicable only to employees not covered by collective bargaining agreements.

(a) *Plan for Supplemental Pensions.* This plan is primarily funded with employee contributions. However, the Debtor makes certain annual contributions to insure the actuarial soundness of the plan. Order No. 278 in these proceedings recognizes that the Debtor had no interest in this fund, which, as of April 30, 1972, amounted to $353,521,624. The Debtor does, however, have the right to terminate the program, in which event the fund would be divided among the participants pro rata.

The only issue now before the Court is whether the plan should be terminated. The Debtor's contributions to the program amount to approximately $2 million per year. The Trustees seek authorization to continue the program in operation.

(b) *Supplementary Benefit Arrangements.* In consequence of the merger between the New York Central and the Pennsylvania Railroad, the Debtor assumed the obligations of two non-contributory plans in effect at the time of the merger: the New York Central sup-

plementary pension plan, and the New Haven pension plan. Under the terms of the respective plans, continuation of the program is optional with the Debtor (NYC ¶¶ 11 and 12; NH ¶ 7). The Central plan applies only to those employees who were not entitled to participate in the contributory pension plan of that railroad and who had 20 years' service. The New Haven plan, applicable to "regular salaried supervisors and officials," was the only pension plan of the New Haven.

Forty-seven employees eligible under the Central plan receive a total of about $23,000 annually, approximately $480 per retiree. Three hundred forty-seven former New Haven employees receive a total of $285,000 per year, approximately $825 per retiree. These amounts are gradually diminishing as a result of attrition.

(c) *Interim or Early Retirement Plan.* This program is designed to facilitate the retirement of selected employees at age 60, rather than at age 65, by assuring total pension benefits equivalent to those which would have been received had retirement been postponed until age 65. Granting of such early retirement is discretionary with the company, but when early retirement has occurred, the company is legally obligated to continue the interim benefits. A similar program, differing somewhat in its mechanics, was inherited from the New York Central in the merger.

For the year 1972, costs to the Debtor under the program amounted to $3,693,000. This cost would decline substantially in future years, unless additional employees are granted early retirement.

Implementation of the early retirement programs produces significant overall economies, making it possible to consolidate certain positions, or to replace highly paid employees with younger, less highly paid substitutes, without the disruptions which would ensue if employees with many years of long and faithful service to the railroad were to be discharged a few years short of retirement. The Trustees estimate that the net savings for the year 1972 amounted to $7.2 million. Projected savings to the year 1980 aggregate some $45 million.

(d) *Additional Pension Benefits.* The Debtor also provides certain additional pension benefits, in two categories: (1) Since 1961, the Debtor has had a policy of crediting prior executive experience with other employers toward the pension entitlements of newly hired executives over 35 years of age earning more than $20,000 annually. The difference between the pension computed with such credit and the pension which would have been paid without such credit is made up from the Debtor's estate. The additional costs under this constructive service policy aggregate approximately $87,000 annually at the present time, and could eventually amount to slightly more than $145,000 annually. The Debtor's constructive service policy follows the universal practice throughout the railroad industry.

(2) Benefits under the Plan for Supplemental Pensions are based upon the employee's average salary over the last five years of employment. Initially, amounts allocated under the Contingent Compensation Plan (*see infra*) were included as salary, for purposes of this computation. However, a 1968 Internal Revenue Service ruling made it necessary to change this policy. Supplement A to the Contingent Compensation Program insures that persons retiring after 1968 will be treated the same as pre-1968 retirees; that is, the Debtor pays the difference between the actual pension benefits and what those benefits would have been if contingent compensation had been included in the computation.

The Trustees propose to continue to carry out all of the foregoing programs.

2. *Contingent Compensation Plan.* This is a complex program under which part of the salary of certain executives, instead of being paid currently in cash,

was allotted to them for distribution after retirement. The amounts thus allotted were transferred to a Contingent Compensation Reserve Fund, for investment. This fund now amounts to slightly more than $10 million.

Shortly before the Debtor filed its reorganization petition, the Board of Directors suspended the Contingent Compensation Program, and it remains in suspension to the present date. The details of the program, and the Trustees' proposals with respect to it, will be discussed below.

## I. LEGAL PRINCIPLES

Resolution of the conflicting contentions of the parties should begin with recognition of the following general principles:

■ 1. Vested, fully funded contributory pension programs are not affected by the employer's filing for reorganization under § 77. The assets in any such pension fund are not "property of the Debtor." This much appears to be conceded by virtually all of the parties, and, in any event, has been resolved by Order No. 278 in these proceedings.

■ 2. Irrespective of whether a pension plan is funded or unfunded, continuation of pension payments thereunder is generally treated as a necessary and usual operating expense, payable by the Trustees during reorganization as a cost of doing business. Justification for this practice has been found to arise from the fact that the employee's past services helped to create and preserve the estate of the Debtor, e. g., Bowen v. Hockley et al., 71 F.2d 781 (4th Cir. 1934), or from the necessity of preserving the loyalty and morale of present and future employees, see: Tate v. New York, New Haven & Hartford R. R., 332 F.2d 449 (2d Cir. 1964). However, insofar as current payments are concerned, the Trustees have the power to make adjustments in the amount and manner of payment, so long as this is done on an equitable and non-discriminatory basis.

Tate v. New York, New Haven & Hartford R. R., *supra.*

■ 3. Contractual arrangements for deferred compensation, as distinguished from pension programs, may be disaffirmed by the Trustees, and the claims of employees or former employees resulting from such disaffirmance are not entitled to any special priority or acceleration; the claimants are merely general creditors of the Debtor's estate. Alpert v. New York, New Haven & Hartford R. R., 348 F.2d 304 (2d Cir. 1965).

■ There is thus no difficulty in concluding that the funded pension plan of the Debtor should continue undisturbed, and that the Trustees should continue to make the required contributions. Nor is there any reason for questioning the propriety of the Trustees continuing to carry out the various unfunded pension programs outlined above. These are merely normal operating expenses.

The principal disputes in the present proceeding have to do with the correct treatment of the Debtor's Contingent Compensation Plan, and the legal propriety of imposing a maximum limitation upon the amount payable to any retiree. These issues will be discussed separately.

## II. THE CONTINGENT COMPENSATION PLAN

■ There are two separate issues, or sets of issues, which must be decided in connection with the Contingent Compensation Program: (1) the status of the Contingent Compensation Fund ("Fund") which was established in connection with this program, and (2) the legal rights of participants in the program (the "Plan"). These issues are, of course, related, in the sense that both the Fund and the Plan must be considered in determining the basic question of whether this is a pension program or some other kind of arrangement; and it is therefore not surprising that the dis-

tinctions between the two sets of issues are sometimes obscured in the arguments of counsel. Nevertheless, the distinctions must be kept in mind.

Eligibility for participation in the Plan was limited to salaried employees and officers (except members of the Committee on Organization and Officers' Salaries) designated by the Board of Directors upon recommendation of the Committee. The stated purpose of the Plan was to attract and retain employees in "executive and other key positions." In practice, only persons earning more than $30,000 per year were eligible. A total of 164 employees participated in the Plan (on the date of bankruptcy, the Debtor had more than 92,000 employees, of whom 121 were participants in the Plan).

I agree with counsel for the objecting participants that the express terms of the Plan must be viewed in the light of the manner in which it was implemented. Generally speaking, whenever the union employees of the Debtor obtained wage increases through collective bargaining, non-agreement employees were given salary increases at approximately the same percentage of increase. And whenever such salary increases become effective, employees participating in the Contingent Compensation Plan received a part of the increase in cash, and the balance was allotted to them under the Plan. The precise apportionment between cash salary increase and allotment to the Plan was carried out on a sliding scale: for participating employees earning between $30,000 and $39,999 annually, 90% of each increase was paid in cash, and 10% went into the Contingent Compensation Plan. For each $10,000 of salary range, these percentages were shifted by 10%, so that, for employees earning $80,000 or more annually, only 20% of each salary increase was paid in cash, and 80% was allotted to the Plan.

Amounts allotted under the Contingent Compensation Plan were treated as operating expenses of the Debtor, but were not reported as compensation paid to the employees, nor were they then taxable as income to the employees.

The Plan provided that, unless otherwise specified by the Committee, allotments accumulated to the credit of a participant would be paid to him, if living, in 10 equal annual installments commencing after his attainment of age 65; or to his designated beneficiary or his estate, in a lump sum. In no case could payment of the full amount of the accumulated allotment be deferred longer than 10 years and 6 months after his death or, in the case of living participants, 10 years and 6 months after attainment of age 65 or severance from employment, whichever was later.

Under the heading "General Description of the Plan," the Plan specifically states "it will normally provide such individuals with benefits after termination of service *by deferring compensation* until termination of service with the company . . . To achieve this purpose the plan provides *a method of compensating employees,* which differs in several respects from the customary cash payment. . . . " [Emphasis supplied.] From this language, from the Plan as a whole, and from the manner in which the Plan was implemented, it is entirely clear that this was a plan for deferred compensation, and not a pension program. Unquestionably, participants in the Plan have valid and subsisting contractual claims against the Debtor's estate. While there are provisions in the Plan for forfeiture, no such forfeiture has ever been asserted in the past, nor does anyone now contend that the participants have forfeited their rights under the Plan. Indeed, the Plan provides, in § 1401, " . . . no amendment, suspension, or termination [of the plan] may without his written consent, apply to the payment to any participant of any contingent allotment previously made to which he would otherwise be entitled."

The Contingent Compensation Reserve Fund which was established in connection with the Plan stands, however, on

an entirely different footing. Section 401 of the Plan provides:

> "Section 401. The Board may authorize the establishment at any time of a contingent compensation reserve fund, hereinafter called the Fund. The Fund shall not be a trust fund and the assets therein shall be available at all times for any corporate purpose of the company. A participant shall have no right in or to any funds or property which may be held in the Fund."

And in § 1201:

> "Section 1201. No participant nor any other person shall have any interest in any fund or in any specific asset or assets of the company by reason of amounts contingently allotted to him. . . ."

And, finally, in § 1401:

> "Section 1401. . . . No consent of any participant shall be required, however, in connection with any amendment, suspension or termination of the contingent compensation reserve fund, which shall remain subject at all times to the unrestricted control of the company."

The Board of Directors did set up the Fund, as authorized, but not required, by the Plan. It is apparent that this step was taken in order to achieve two basic objectives: (1) to establish a reserve against the company's contingent liabilities under the Plan; and (2) to provide a mechanism for investing the reserve, and for enabling the participants to obtain the benefits resulting from such investment. Whenever a participant fulfilled all of the requirements of the Plan (i. e., retired and was at least 65 years of age, or died) the total amount payable to him was determined by adding his accumulated allotments which had never been invested in the Fund, to the value represented by his proportionate share of the Fund. In theory, the participants were at risk; if the Fund's investments decreased in value, the participants' deferred compensation might be less than had been allotted

to them over the years. As a practical matter, however, the Committee was in a position to terminate the Fund at any time, and presumably would have done so if faced with any genuine prospect of erosion. Actually, the Fund increased in value over the years; but for the intervention of bankruptcy, the deferred compensation which would have been paid to the participants would in most cases have substantially exceeded the amounts originally allotted.

In view of the provisions of the Plan quoted above, the conclusion is inescapable that the participants have no claim whatever to the reserve Fund as such. The assets of the Fund were "property of the Debtor" on the date of bankruptcy, and are now vested in the Trustees. The objectors nevertheless argue that, in the hands of the Trustees, the assets of the Fund are impressed with a trust, or should be so treated on the basis of equitable considerations. In support of this argument, a number of factors are stressed.

(a) The assets of the Fund were always segregated (but the uninvested contingent allotments were commingled with the general assets of the Debtor for brief periods).

(b) From a balance sheet standpoint, the assets of the Fund, and uninvested contingent allotments, did not contribute to the Debtor's net worth (balancing debits and credits were shown). From this, the objectors contend that no creditor of the Debtor ever relied upon the Fund in extending credit. But this somewhat overstates the case. A creditor who examined the documents establishing the Plan and the Fund would have learned that the Fund assets were unencumbered assets of the Debtor. For present purposes, whether creditors made such inquiry and actually relied upon these assets in extending credit is not necessarily controlling.

(c) At no time, even in the cash crisis which immediately preceded bankruptcy, did the Debtor see fit to use the Fund for corporate purposes, or to borrow against it. While this can be interpret-

ed as showing that the Debtor's managers considered that these assets were held in trust, it may simply provide some insight into their sense of priorities. Moreover, the action of the Board of Directors, purportedly taken on June 20, 1970 (the day before bankruptcy) terminating all further contingent allotments, and directing that the participants' full salaries should thereafter be paid in cash, is persuasive evidence that all concerned understood the vulnerability of the arrangement in the event of bankruptcy.

The objectors further point out that many of the participants have made commitments, in such matters as estate planning and scale of living, in reliance upon anticipated receipt of contingent compensation pursuant to the Plan. This is undoubtedly a valid consideration. It establishes that the participants, like so many others, relied upon the financial soundness of the Debtor. It provides unnecessary further support for the proposition that the participants have valid claims against the Debtor's estate. But this factor must be balanced against countervailing equities in determining the extent to which these claims should be satisfied on a current basis during reorganization, rather than in the reorganization plan.

Originally, the Trustees sought authorization to terminate the Contingent Compensation Plan and disaffirm all obligations thereunder (Document No. 740), thus making the entire fund immediately available for general railroad purposes. Thereafter, recognizing the desirability of improving morale among the present employees, and after extensive negotiations, the Trustees modified their proposal. In their "revised petition . . . concerning Penn Central Transportation retirement programs" (Document No. 1793), the trustees requested leave to continue these programs in effect; and in their "petition . . . for authority to settle claims under the contingent compensation plan" (Document No. 1794), the Trustees sought approval of an agreement embodying the following features: Of the approximately $8.6 million in the Fund as of December 31, 1970, the Trustees would remove approximately $6 million for general railroad purposes, and the balance of $2.6 million would be placed in a reserve fund managed by an independent financial advisor and distributed to the participants according to the terms of the Plan. The proposed allocation of the Fund is calculated to restore to the participants the amounts which they had actually been allotted and had not yet received, or their pro rata share of the Fund as of December 31, 1970, whichever was less (subject, in certain cases, to the $50,000 limitation hereinafter discussed). The participants would not benefit in the growth of the Fund since December 31, 1970. Of the 121 participants in the Plan as of June 21, 1970, 81 agreed to the Trustees' proposal, 33 objected, and 7 expressed no view.

For a variety of reasons, the Trustees' petitions were not immediately acted upon by this Court. The trustees' proposal has now, in effect, been withdrawn, and a further modification thereof substituted. In the meantime, the Fund has increased to approximately $10 million.

The Trustees' present proposal arises by reason of the prospect of a short-range cash emergency. The Trustees now propose to liquidate all of the assets in the Fund, and use the entire sum for current operating expenses, but to undertake, as an administrative obligation, to pay to participants, as cash permits, the same amounts contemplated by the earlier agreement. A further hearing to consider this proposal was held on January 10, 1973, but the line-up of objectors and proponents remains substantially unchanged. Certain indenture trustees who endorse the legal position taken by the Trustees of the debtor vis-a-vis the participants, pressed further objections to the Trustees' proposed use of the Fund.

Under the Trustees' proposal, the participants would relinquish all claims against the Debtor's estate and the

Trustees, except their right to receive amounts equivalent to the unpaid balance of their contingent allotments (or their share of the Fund, valued as of December 31, 1970). I believe this over-simplifies the issue, and arguably, cannot lawfully be imposed upon the participants without their consent. While it is true that the participants have no claim to the Fund itself, it is clear that the amounts of their claims under the Plan are to be measured by their pro rata share of the value of the assets in the Fund. The fact that the Committee could lawfully have refrained from investing any of the contingent allotments does not alter the plain language of the Plan, to the effect that fluctuations in the value of the Fund investments are to be reflected by equivalent changes (here, increases in most cases) in the participants' respective entitlements under the Plan. (Recognition of the validity of this analysis may be implicit in the inclusion of a "most favored nation" clause in the Trustees' proposed agreement; this would purportedly assure settling participants further payments if the non-settling participants ultimately should fare better than the agreement contemplates.)

Thus, the narrow issue presented is whether, recognizing that all participants have valid lawful claims to the full amount provided for them under the Plan, it would be a proper exercise of discretion to permit present recognition and payment of a portion of each such claim during reorganization, while requiring such claimants to await the adoption of a plan of reorganization before determining the correct treatment of the balance of their claims; and whether the basis on which the Trustees propose to grant such partial recognition is a fair and equitable one.

Since I am satisfied that, strictly speaking, the Trustees would have the right to defer the obligations created by the Contingent Compensation Plan in their entirety, leaving all participants to the proof of claims program, I am satisfied that the participants would have no just cause for complaint if a part of their claims should now be recognized and paid, so long as substantially equal treatment is afforded them. And since I am also persuaded that efficient operation of the railroad requires that employee morale be maintained at a high level, and that capable employees be encouraged to continue in the employ of the railroad, I am likewise satisfied that no creditor or other interest can validly object to the Trustees' proposal to assume the obligation of restoring to the participants the balance of their own 'contributions' under the Plan.

It is correct, as the opponents argue, that under the Trustees' proposal, present employees of the Debtor would receive proportionately larger payments during reorganization (i. e., proportionate to the amounts of their total claims) than would retired participants. This is due to the fact that pre-reorganization payments to retired employees were measured by the full amount of each participant's entitlement; stated otherwise, the retired participants have already received payments which recognized the impact of increased values in the Fund. By the same token, however, the total dollars received by retired participants (in advance of the implementation of a plan of reorganization) will be greater than the amount received by present employees. This, of course, is as it should be, since the retired employees made 'contributions' over a longer period, and in greater amounts, than the present employees.

On balance, I see no inequity in charging amounts which participants have already received from the Contingent Compensation Plan against the amounts which the Trustees will be required to pay in the course of the reorganization.

A further factor bears mention. It is apparent that the Contingent Compensation Plan was carefully drawn with a view toward possible tax consequences. As a general proposition, under the "constructive receipt" doctrine, to the extent that an employee had a non-for-

feitable interest in the allotments, the allotments would have been includible in the employee's gross income in the year of the allotment. *See* Revenue Ruling 60–31, 1960–1 Cum.Bull. 174; Treasury Regulation 1.451–2; Doty v. United States, 323 F.2d 649 (6th Cir. 1963); E. T. Sproull v. Commissioner of Internal Revenue, 16 T.C.C. 244, aff'd 194 F.2d 541 (6th Cir. 1952). It is argued that the provisions of the Plan relating to the Debtor's right to use the Fund's assets for corporate purposes were not necessary to secure preferential tax treatment to the participants; but rather, these provisions were included to insure deductibility by the company of contingent compensation allotments at the time payments were made under the Plan. Assuming this to be true, one could hardly criticize management for such action: no inference of over-reaching can be drawn. Moreover, nothing in the record negates the natural assumption that the corporate use provisions were included for the independent purpose of having the Fund's assets available should the need arise. I find unacceptable the suggestion that the clear language of the Plan documents should be brushed aside as unimportant because inserted in part for tax purposes. To put the matter in a nutshell, in order to immunize the allotments from current taxation as income of the participants, and to insure deductibility by the employer, the parties set up a program which was vulnerable in bankruptcy. The Trustees' proposals represent a reasonable attempt to mitigate the adverse impact of bankruptcy, while preserving the tax consequences which were bargained for.

A further argument is made by some of the objectors that they were unaware of all of the ramifications of the Contingent Compensation Plan, believed that their 'contributions' were being held for them in trust, and would have sought employment elsewhere had they known of the true situation. The record does not support these assertions. While it is apparently correct that the participants did not see, and may not have had access to, the documents establishing the Plan, they were furnished, from time to time, summaries of these documents. These summaries appear in the record as follows: Exhibit C–1, dated December 29, 1952; C–2, dated May 20, 1955; C–3, dated January 20, 1956; C–4, dated September 25, 1963; C–5, dated February 1, 1968; and C–6, dated October 1, 1969. I have carefully reviewed all of these informational summaries and find that, while there are some variations in style and emphasis, all fairly and accurately portray the true nature of the Plan, in reasonably brief and non-technical language. In every case, the concluding section plainly states: "The assets of the contingent compensation reserve fund remain assets of the [railroad company] and subject to the rights of all creditors of the company. . . ." Moreover, there is actually no evidence in the record that any participant misunderstood the situation.

## III. THE $50,000 LIMITATION

By Order No. 12 in these proceedings, I directed that, until further order of Court, no payments be made from the estate of the Debtor to or on behalf of persons no longer employed by the Debtor on a full-time basis, at a rate in excess of $50,000 per annum. This Order remains in effect, and the Trustees propose to incorporate that limitation in the interim arrangements now under discussion.

As to six participants in the Contingent Compensation Plan (Messrs. Symes, Greenough, Saunders, Bevan, Perlman and Smucker), the effect of this limitation would be to reduce or eliminate their current participation in the Contingent Compensation Plan, by reason of the amounts being paid them currently under various aspects of the pension program. At the present time, by reason of Order No. 12, no retired employee is receiving more than $50,000 per year, in the aggregate, from the Debtor's retirement and contingent compensation programs. Counsel for all

parties appear to be in agreement that participation in the fully funded plan (the Plan for Supplemental Pensions) cannot be thus limited. Mr. Symes is entitled to receive $52,776.12 per year from the funded plan, and Mr. Greenough is entitled to receive $68,478.68 per year from that program. Under the Trustees' proposal Mr. Greenough's contingent compensation would be the value of his units, $222,140.87, less contingent compensation paid, $200,000, or $22,214.-08, divided by the appropriate number of payments remaining to be paid under the Plan. The $50,000 limitation would preclude payment of that amount. Mr. Symes is entitled to no contingent compensation under the Trustees' proposal, since he has already received far more than either his original allotments or the value of his units on December 31, 1970. A special $10,000 per year benefit granted Mr. Symes by the Board after his retirement would also be precluded by the $50,000 limitation. Similarly, Mr. Smucker would not receive $5,515 from the unfunded programs that he would otherwise be entitled to, nor would he receive his contingent compensation payment computed at the valuation date of $11,154.15 per annum.

In the case of Mr. Perlman, his entitlement under the funded plan is $41,709.84 per year, which is being paid him. But for the $50,000 limitation, he would be entitled, under the Trustees' proposal, to receive $23,297.22 per year from the Contingent Compensation Plan. Application of the $50,000 limitation would reduce his participation in the Contingent Compensation Plan to approximately $8,200 annually.[1]

In the case of Mr. Bevan, his entitlement under the funded plan is $27,437.-27 annually, and under other retirement programs an additional $50,194.24 annually. By reason of the application of the $50,000 limitation, his participation in the unfunded pension programs would be reduced, and his participation under the Contingent Compensation Plan would be eliminated (i. e., insofar as current payments are concerned).

In the case of Mr. Saunders, he is entitled to receive annually $12,247.72 from the funded plan and $78,344.16 from other retirement programs. Application of the $50,000 limitation reduces Mr. Saunders' payments from the unfunded programs and eliminates current participation in the Contingent Compensation Plan. His entitlement under the Trustees' settlement formula would otherwise be $41,200 annually.

In the aggregate, application of the $50,000 limitation would reduce the amount payable on a current basis, under the contingent compensation plan proposal of the Trustees, by approximately $102,000 annually, and would reduce payments from the Debtor's estate under the unfunded retirement programs and otherwise in the amount of about $78,000 for the current year (this latter amount would fluctuate from year to year).

To the extent that the Trustees are required, or find it advisable, to establish a reserve to meet the obligations they propose to assume under the Contingent Compensation Plan, application of the $50,000 limitation would reduce the amount of the required reserve by approximately $1 million.

I have carefully considered all of the arguments advanced on all sides of this question, and have concluded that the $50,000 limitation originally imposed should remain in effect, insofar as that limitation can be achieved through payments within the control of the Trustees. That is to say, while neither the Trustees nor this Court can lawfully interfere with entitlements under the Plan for Supplemental Pensions (the fully funded plan), no payments should be

---

1. Shortly before reorganization, the Board of Directors entered into a further contract with Mr. Perlman, under which he would have performed services as a consultant, at a salary of $50,000 per year. This contract was disaffirmed by the Trustees before it became effective. Issues arising out of this disaffirmance are not before the Court at this time.

made from the Debtor's estate during reorganization which would, as to any retiree, result in a total post-retirement income from all sources related to the Debtor (*i. e.*, the funded plan, the unfunded retirement programs, and the Contingent Compensation Plan) in excess of $50,000 per year.

In my view, it would be unconscionable to permit the payment in full of all retirement and deferred compensation, no matter how generous the amount, while the Debtor is unable to pay current taxes, or, for example, to pay pre-bankruptcy personal injury claims for which it is legally liable. Conversely, elimination of all pension and deferred compensation payments from the Debtor's estate would be unduly harsh and, as noted above, would be likely to interfere with the smooth functioning of the railroad. The only acceptable solution is to impose a limitation of some kind.

It has been suggested that the only fair way to impose such a limitation would be on a percentage basis. I reject this approach, believing it would probably involve greater inequities than the flat limitation proposed. Moreover, a percentage reduction might make it difficult for retirees at the lower end of the scale to maintain themselves comfortably, and would permit payments to retirees at the higher end of the scale at unreasonably generous levels. While it is true that the flat $50,000 limitation has a greater dollar impact upon some retirees than others, it assures all retirees of a reasonably comfortable standard of living; moreover, for the most part, the retirees at the higher end of the scale achieved that position as the result of pre-bankruptcy salary policies which are most clearly vulnerable to criticism. On balance, I believe the $50,000 limitation represents an acceptable resolution of these competing considerations.

## IV. IMPLEMENTATION

The Trustees originally proposed to set aside $2.6 million of the assets of the Contingent Compensation Reserve Fund in a separate fund, as a reserve against the payments which they are willing to assume under the Plan. They now propose to eliminate this reserve, and to make payments under the Plan "as cash permits." For the reasons previously discussed, it is clear that the entire Fund may be utilized, free and clear of claims of the participants. The question remains, however, whether it would be desirable for the Trustees to expend the entire Fund to meet other current operating expenses, without regard to the obligations which the Trustees propose to assume.

It may well be that, if it should become necessary to choose between using the entire Fund or shutting down the railroad, the former would be the appropriate choice. But until such a choice becomes absolutely necessary, on the basis of actual rather than projected figures, I believe the $2.6 million should be held intact, as a reserve to meet the obligations assumed by the Trustees.

The Trustees' settlement proposal would have required participants to release all further claims arising under the Plan in order to receive current payments computed on the basis of (a) their total allotments, or (b) their share of the value represented by the Fund as of December 31, 1970, whichever was less; all payments previously received to be credited on account. They would thus have forever lost any right to claim a share in the incremental values in the Fund. On the other hand, they would have received payment during reorganization, and would have shared in any increase in the $2.6 million set aside for their benefit.

The arrangement approved herein embodies the following features: (1) the same formula for determining current payments is retained; (2) the validity of the participants' claims for the full amounts due under the Plan, calculated as of December 31, 1970, is preserved; (3) questions as to the participants' rights to share in the growth of the Fund from December 31, 1970 to the present date remain open for future determina-

tion; (4) $2.6 million of the Fund will not be used for operating expenses unless so ordered by this Court in the case of absolute necessity; (5) to the extent that the $2.6 million reserve now being established may grow through investment, and is not used for operating expenses, the Trustees may at some future time be authorized to permit the participants to share in such growth.

I do not now decide that the participants could not lawfully be required to give up all further claims in exchange for current partial payment, but merely that there is room for doubt on the subject, and that the arrangements outlined above seem preferable.

Certain indenture trustees take the position that, while the entire Fund belongs to the Debtor's estate, free of any claims of the participants, it is subject to the lien of the trustees' certificates guaranteed by the federal government, and cannot be used to meet operating expenses except on the strength of a present decision by this Court that the lien of the trustees' certificates, as to encumbered assets of the Debtor, is reduced by that amount. I do not believe that issue is ripe for decision at this time. The government does not object to the Trustees' proposal, and I am satisfied that the use of unencumbered assets to meet operating expenses is entirely consistent with the Emergency Rail Services Act of 1970 (45 U.S.C. §§ 661–69) and the terms of the government's guarantee. For this Court now to attempt to forecast all of the possible legal consequences would serve no useful purpose.

## V. CONCLUSIONS

1. The fully funded Plan for Supplemental Pensions should remain in full force and effect, unimpaired by the Debtor's bankruptcy. The Trustees should be authorized to continue to make contributions thereto, as a cost of doing business.

2. Subject to the limitation hereinafter mentioned, the Trustees should continue to make payments required by the various unfunded pension programs, as a cost of doing business.

3. Participants in the Contingent Compensation Plan have no legal or equitable interest in or claim to the assets in the Contingent Compensation Reserve Fund. Each participant in the Contingent Compensation Plan has a valid claim for the full amount to which he is entitled under the terms of the Plan, but the Trustees should be authorized and directed to recognize such claims during reorganization only to the extent represented by the formula proposed by the Trustees in settlement (i. e., reimbursement of accrued allotments, or pro rata share of the Fund as of December 31, 1970, whichever was less); and such claims should be paid during reorganization only as cash permits. Unless and until otherwise ordered by this Court, the Trustees should set aside and reserve the sum of $2.6 million in order to meet these payments.

4. During reorganization, the Trustees should make no payments from the estate of the Debtor (whether by reason of unfunded retirement programs, or the Contingent Compensation Plan) where the effect of such payment would be that the aggregate amount received by a retired employee from all sources related to the Debtor (i. e., the Plan for Supplemental Pensions, unfunded retirement programs, and the Contingent Compensation Plan) would exceed $50,000 per annum.

Appropriate orders will be entered in conformity with the views expressed herein.

## ORDER NO. 1087

Authorizing the Trustees to Carry Out the Provisions of Certain Pension Programs, and to Make Certain Payments on Account of Obligations Arising Under the Contingent Compensation Plan

And now, this 26th day of January, 1973, upon consideration of the various Petitions of the Trustees relating to the

retirement and contingent compensation programs of the Debtor (Documents Nos. 740, 1226, 1793 and 1794), and after hearings thereon duly noticed, it is ordered:

1. The Trustees are authorized to continue in effect the Plan for Supplemental Pensions, in conformity with Order No. 278, and to make all payments required to implement the same.

2. Subject to the limitation set forth in paragraph 5 of this Order, the Trustees are authorized to continue in effect all of the existing pension programs and policies of the Debtor, and to make all payments required to implement the same.

3. Subject to the limitation set forth in paragraph 5 of this Order, from time to time during reorganization, as cash permits, the Trustees are authorized to pay to eligible participants in the (former) Contingent Compensation Plan of the Debtor amounts determined—in each case by the following formula, viz., (a) the lesser of (i) the total allocations to such participant, or (ii) an amount equal to the value of such participant's share of the Contingent Compensation Reserve Fund as of December 31, 1970, less (b) the aggregate amount of payments heretofore made to such participant on account of his participation. All payments to participants during reorganization shall be made on a pro rata basis in relation to the amounts thus determined. Except as herein provided, disposition of all further claims on behalf of participants in the (former) Contingent Compensation Plan of the Debtor is deferred pending adoption of a reorganization plan.

4. It is adjudged and declared that the assets in the Contingent Compensation Fund are the property of the trustees, free and clear of all claims, legal or equitable, of the participants or former participants in the Contingent Compensation Plan.

5. In no event shall the Trustees make any payment to or on behalf of any former officer or employee of the Debtor where the effect of such payment would be the receipt by such former officer or employee, from the Plan for Supplemental Pensions, all other unfunded retirement programs of the Debtor, and the Contingent Compensation Plan, in the aggregate, of more than $50,000 per annum.