484 F.2d 1300
 In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.
Appeal of TWENTY-ONE RETIRED EMPLOYEES, Appellants in No. 73-1081.
Appeal of David C. BEVAN, Appellant in No. 73-1098.
Appeal of Alfred E. PERLMAN, Appellant in No. 73-1204.
Appeal of Stuart T. SAUNDERS, Appellant in No. 73-1205.
Appeal of Arthur E. BAYLIS et al., Appellants in No. 73-1206.
Appeal of Allen J. GREENOUGH, Appellant in Nos. 73-1207 and 73-1208.
 Nos. 73-1081, 73-1098, and 73-1204 to 73-1208.
 United States Court of Appeals,
Third Circuit.
 Argued May 14, 1973.
Decided Aug. 21, 1973.
 
 Theodore R. Mann, Barry E. Ungar, Mann & Ungar, Philadelphia, Pa., for appellants, Twenty-one Retired Employees.
 Joseph W. Swain, Jr., Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for appellant, James M. Symes.
 James M. Marsh, LaBrum & Doak, Philadelphia, Pa., for appellant, David C. Bevan.
 Thomas B. Rutter, Philadelphia, Pa., for appellant, Alfred E. Perlman.
 Bennett G. Picker, Steven R. Waxman, Bolger & Picker, Philadelphia, Pa., for appellant, Stuart T. Saunders.
 George M. Kevlin, Henry M. Irwin, Kevlin & Irwin, Philadelphia, Pa., for appellants, Arthur E. Baylis, and others.
 Jacob I. Goodstein, Goodstein, Zamore, Mehlman & Krones, New York City, for appellant, Arthur J. Greenough.
 Robert W. Blanchette, Marvin Comisky, Goncer M. Krestal, Blank, Rome, Klaus & Comisky, Philadelphia, Pa., for appellees, Trustees of Property of Penn Central Transportation Co., Debtor.
 Before VAN DUSEN, GIBBONS and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 We here consider consolidated appeals from two orders, Nos. 1087 and 1088 of the Penn Central reorganization court, which deal with the continuation of payments to former Penn Central executives pursuant to several retirement programs. The district court's opinion on these orders is reported. In the Matter of Penn Central Transportation Company, Debtor, 354 F.Supp. 408 (E.D. Pa.1973). Twenty-eight retired Penn Central employees have appealed. The appeals present as issues:
 
 
 2
 (1) common to all appellants, the propriety of the district court's conclusion that assets held in Penn Central's Contingent Compensation Plan (CCP) became, on the filing of the petition for reorganization, property of the trustees in reorganization, leaving appellants as creditors holding unsecured claims for deferred compensation;
 
 
 3
 (2) common to six appellants,[1] the propriety of the district court's ruling that the reorganization court would continue payments under the Contingent Compensation Plan as expenses of operation of the reorganization, but with a limitation that total pension payments from the Penn Central Plan for Supplemental Pensions[2] and Penn Central unfunded retirement programs,[3] including the Contingent Compensation Plan, would not exceed $50,000 a year to any former employee; and
 
 
 4
 (3) in the case of Symes, the application of the $50,000-a-year limitation not only to his claim under the Contingent Compensation Plan, but also to his claim under a $10,000-a-year special pension awarded to him by the Penn Central Board of Directors on October 23, 1968. Mr. Symes' case will be dealt with separately hereinafter.
 
 
 5
 The Contingent Compensation Plan was established by the Board of Directors of the former Pennsylvania Railroad in 1952, was continued after the 1968 merger with New York Central, and was amended, unilaterally, by the Board of Directors from time to time thereafter. When cash salary increases were granted to union employees or to non-union employees not included in the CCP, the qualifying participants were awarded comparable adjustments in compensation, but not in cash. Qualifying participants included employees earning $30,000 or more a year. In its preamble the CCP contains this general description:
 
 
 6
 "As more fully described below, the Board of Directors, from time to time, may allot to any employe an amount representing contingent compensation subject to the terms and conditions set forth herein. At the discretion of the Board an amount equivalent to such allotment, or any part thereof, may be transferred to a reserve fund and invested; and to the extent of such transfer, the payments to a participant shall be measured by the value of the reserve fund. However, the assets held in the reserve fund will at all times be available for any corporate purpose.
 
 
 7
 After retirement the compensation contingently allotted to a qualifying employe will be paid to him in installments, subject to certain conditions. In the event of death, before or after retirement, payments will be made to the employe's beneficiary."
 
 
 8
 During the life of the CCP 164 employees were designated by a committee of the Board of Directors as qualifying participants. From 1952, when it was adopted, until June 21, 1970, when by Board action it was terminated, salary increases to the qualifying participants were made in the form of allotments to the CCP. The plan provided for periodic transfer of the allotments to a reserve fund for investment. The extent of such transfer payments to a participant would be measured by the value of the reserve fund. The participant's allotment units would be paid out after his retirement in annual installments, the amount of an installment being determined by reference to the value of his allotment units on the valuation date preceding the date of payment. The CCP contained forfeiture provisions applicable both before and after retirement. With respect to the reserve fund the CCP provided in relevant parts:
 
 
 9
 "Section 401. The Board may authorize the establishment at any time of a Contingent Compensation Reserve Fund, hereinafter called the Fund. The Fund shall not be a trust fund and the assets therein shall be available at all times for any corporate purpose of the Company. A participant shall have no right in or to any funds or property which may be held in the Fund.
 
 
 10
 ******
 
 
 11
 * * *
 
 
 12
 Section 1201. No participant nor any other person shall have any interest in any fund or in any specific asset or assets of the Company by reason of amounts contingently allotted to him, nor any right to receive any distribution under the Plan except as and to the extent expressly provided in the Plan . . . .
 
 
 13
 Section 1401. . . . No consent of any participant shall be required, however, in connection with any amendment, suspension or termination of the Contingent Compensation Reserve Fund, which shall remain subject at all times to the unrestricted control of the Company."
 
 
 14
 From time to time Penn Central distributed to qualifying employees descriptive summaries of the CCP. Typical of the relevant language of such summaries is the description from the one dated October 1, 1969:
 
 
 15
 "Either the contingent allotments or the Fund may be discontinued at any time at the discretion of the Board, however, in either instance employes' rights remain whole for the period prior to such termination date.
 
 
 16
 ******
 
 
 17
 * * *
 
 
 18
 The assets of the Contingent Compensation Reserve Fund remain assets of the Penn Central Transportation Company and subject to the rights of all creditors of the Company. No participant has any right to receive payments at any other times or in any other amounts than as provided by the Plan."
 
 
 19
 When, shortly before the filing of the petition for reorganization, the Penn Central directors terminated the CCP, the Contingent Compensation Reserve Fund contained in excess of $8.6 million. Of this sum, a substantial amount represented appreciation in the fund investments over the initial allotments made on account of the participants' services. Further appreciation took place after the filing of the petition for reorganization, so that when the district court made the rulings appealed from the Fund was valued at over $10 million.
 
 
 20
 Originally the trustees petitioned the reorganization court for authorization to disaffirm all obligations under the CCP and to expend the entire Contingent Compensation Reserve Fund for general railroad purposes. Thereafter, recognizing that such a result could adversely affect the morale of those qualifying participants who were still employed by the railroad, the trustees filed a revised petition seeking approval of a proposed settlement with the CCP claimants. Under this proposed settlement, $2.6 million of the Fund balance would be placed in a reserve fund managed by an independent financial advisor and would be distributed to the participants in proportion to their allotment units, but with the value fixed at the amounts actually allotted but not yet received, or at the value of the pro rata shares of the Fund as of December 31, 1970, whichever was less, and all subject to a $50,000 limitation per person per year. The proposed settlement had other features which need not be alluded to because for a number of reasons the offer was withdrawn, and the matter proceeded to hearing on a revised trustees' proposal. That proposal was to liquidate the entire Fund, to use the entire Fund for operating expenses, but to pay the participants, as an administration expense, as cash permitted, the amounts proposed in the earlier settlement proposal. The trustees contemplated that such an undertaking by them would be conditioned upon the relinquishment by the participants of any rights to receive payments beyond their actual allotments (or their share in the Fund valued as of December 31, 1970, if that was lower).
 
 
 21
 The district court did not go so far as the trustees proposed. The court's conclusions here challenged were:
 
 
 22
 "3. Participants in the Contingent Compensation Plan have no legal or equitable interest in or claim to the assets in the Contingent Compensation Reserve Fund. Each participant in the Contingent Compensation Plan has a valid claim for the full amount to which he is entitled under the terms of the Plan, but the Trustees should be authorized and directed to recognize such claims during reorganization only to the extent represented by the formula proposed by the Trustees in settlement (i. e., reimbursement of accrued allotments, or pro rata share of the Fund as of December 31, 1970, whichever was less); and such claims should be paid during reorganization only as cash permits. Unless and until otherwise ordered by this Court, the Trustees should set aside and reserve the sum of $2.6 million in order to meet these payments.
 
 
 23
 4. During reorganization, the Trustees should make no payments from the estate of the Debtor (whether by reason of unfunded retirement programs, or the Contingent Compensation Plan) where the effect of such payment would be that the aggregate amount received by a retired employee from all sources related to the Debtor (i. e., the Plan for Supplemental Pensions, unfunded retirement programs, and the Contingent Compensation Plan) would exceed $50,000 per annum." 354 F.Supp. at 419.
 
 
 24
 This disposition of the Fund was implemented by Order No. 1088, and a stay was denied both by the district court and by this court. All but $2.6 million has now been expended for general railroad purposes. While Order No. 1088 provides that this sum be invested as a reserve to meet the payments to participants contemplated by the decision, it also provides:
 
 
 25
 "Said reserve shall remain the property of the Trustees; establishment and maintenance of said reserve shall not give rise to any legal or equitable interest or claim therein on behalf of any participant."
 
 
 26
 Summarizing, then, the orders appealed from (1) relegated qualifying participants in the CCP to the status of unsecured creditors, to be dealt with in the plan of reorganization in some as yet undetermined manner, (2) authorized the trustees to treat the participants' claims as in the nature of unfunded pension liabilities and to pay these, in reduced amounts, as current operating expenses, and (3) set aside from the $10 million Contingent Compensation Reserve Fund $2.6 million as a reserve from which to meet those operating expenses. The reserve was recognized to be a matter of grace, however, and subject to reconsideration by the reorganization court.
 
 
 27
 It is common ground between the appellants and the trustee-appellees that in a railroad reorganization, some payment on account of unfunded pension liabilities by the trustees are properly treated as necessary and usual operating expenses and as a cost of doing business. In Tate v. New York, New Haven & Hartford R. R., 332 F.2d 449 (2d Cir. 1964), the Second Circuit justified such payments as necessary to preserve the morale of present and future employees. In Bowen v. Hockley, 71 F.2d 781, 785-786 (4th Cir. 1934), the practice was justified on the ground that the pensioners' past services helped to create and preserve the estate being administered. Apparently payment of unfunded pension liabilities during a railroad reorganization is a recognized tradition in the industry. See Myers, Financial Impact of Pension Costs on the Railroad Industry, 7 Lab.L.J. 265, 266 (1956). Compare In re Compania De Los Ferrocarriles De Puerto Rico, 76 F.Supp. 521 (D.P.R.1948); cf. Alpert v. New York, New Haven & Hartford R. R., 348 F.2d 304 (2d Cir. 1965) (distinguishing deferred compensation contracts from pensions). This court has not explicitly ruled on the practice. Since no party to this appeal challenges it, we accept it, for present purposes, as a governing rule. Nor do we reach in this case any issue as to the ultimate priority, if any, to which the CCP claimants may be entitled in a reorganization plan. This appeal deals only with the district court's rejection of appellants' contentions as to their present rights in the Contingent Compensation Reserve Fund. These contentions are:
 
 
 28
 (1) that the CCP should be regarded as a funded rather than as an unfunded pension plan, (or as the trustees prefer, deferred compensation plan) and that the trustees have no interest in the Fund;
 
 
 29
 (2) that at least as to those participants who retired prior to termination of the CCP, their claims should be treated as vested and secured;
 
 
 30
 (3) that the reduction in benefits resulting from the refusal of the court to give effect to appreciation in the Fund beyond the original allotments is inconsistent with the practice, referred to above, of recognizing pension liabilities during a railroad reorganization; and
 
 
 31
 (4) that the $50,000 per annum ceiling on pension payments during reorganization is discriminatory and improper.
 
 
 32
 In support of their contention that the CCP should be regarded as a funded rather than an unfunded pension plan, appellants argue that the Contingent Compensation Reserve Fund was a trust, express, constructive, or resulting. The Plan provisions quoted above, the Plan as a whole, and all the documents in the record referring to it negate any intention on the part of the Pennsylvania or Penn Central Directors to create an express trust. See Restatement (Second) of Trusts Sec. 2 (1959). Since there was neither an express trust which failed nor a transfer of property paid for by another, there could be no resulting trust. Restatement (Second) of Trusts, chapter 12 (1959). Had the Fund, while held by Penn Central, been held in a trust capacity, there would be room for argument that the reorganization trustees became constructive trustees. Restatement of Restitution Sec. 160 (1937). But where, as here, the Plan made clear that the Fund was held as a part of the company's general assets, subject at all times to its use and disposition, and subject to the claims of its creditors, there is no basis from which a constructive trust could be implied. The CCP was, as the district court found, nothing more than an executory contract calling for compensation after retirement.
 
 
 33
 Nor can any distinction be made between those participants retired prior to termination of the CCP and those still employed thereafter. The Plan itself makes no such distinction. Even the amount to be paid remains uncertain until the valuation date immediately prior to the payment. Moreover, the benefits remain forfeitable even after retirement if the retiree does not refrain from activities adversely affecting the company's best interests. Compare the Plan with Retirement Board v. McGovern, 316 Pa. 161, 174 A. 400 (1934). But in any event, appellants' argument that their rights "vested" upon retirement is entirely beside the point. Their rights may well be "vested"; they are nevertheless unsecured. The issue remains: how should "vested" executory contract pension rights be treated during a railroad reorganization.
 
 
 34
 Accepting, as have the parties, the general principle that some payments of unfunded pension liabilities are a practical necessity if a railroad is to be successfully operated in reorganization, it does not follow that in applying the principle the reorganization court must enforce each executory pension contract exactly in accordance with its terms. We are dealing with the powers of a court of equity to deal practically with the ongoing problems of employee morale, retention and recruitment. Even looked upon as an equitable recognition of the contributions made to the creation and preservation of the estate, the practice does not necessitate confining the court to the straight jacket of the underlying contract. Indeed, one can envisage a situation where recognizing the exact terms of an unfunded pension contract might both have an adverse effect upon morale of present and future employees and be inconsistent with any contribution made to the debtor's estate. Accepting the principle of some payment of unfunded pension liabilities, no more is required than a responsible exercise of equitable discretion. We find no abuse of discretion in Order No. 1087.
 
 
 35
 What we have said about the court's equitable discretion with respect to the treatment of payments based upon appreciation in the Contingent Compensation Reserve Fund applies as well to the $50,000-a-year limit. The district court found as a fact that this level of pension would afford each of the participants a decent living standard. We will not second guess his well-considered judgment that no more was appropriate during the pendency of the reorganization.
 
 
 36
 Finally, there is the separate contention of appellant Symes that the court erred in refusing to continue payment, during reorganization, of a special pension of $10,000 a year voted by the Board of Directors on October 23, 1968. Order No. 1087 makes no final disposition of Mr. Symes' claim on this special arrangement, but it is subject to the overall limitation of $50,000 a year, and Mr. Symes' pensions from other Penn Central sources exceed this amount. For purposes of payment during reorganization, nothing distinguishes the October 23, 1968 unfunded pension contract from the other unfunded pension contracts dealt with in Order No. 1087.
 
 
 37
 We emphasize that because the parties agree that some payments on unfunded pension liabilities during a railroad reorganization are at least proper, this opinion has not dealt definitively with questions of the extent of or the limitations upon the reorganization court's power in this respect. We also emphasize that the orders appealed from do not determine how the appellants' claims should be dealt with in a plan of reorganization or a liquidation.
 
 
 38
 Orders No. 1087 and 1088 will be affirmed.
 
 
 39
 VAN DUSEN, Circuit Judge (dissenting in part):
 
 
 40
 I respectfully dissent only insofar as the majority opinion fails to grant to James M. Symes any part of the $10,000. per year special pension granted on October 23, 1968, after over 50 years[1] of exceedingly valuable service to the Pennsylvania Railroad. The record, including the Appendix, submitted with respect to this special pension, establishes that the principles of equity and fairness require the payment of all or part of this pension to him for the reasons stated in part II of the brief filed on his behalf concerning this special pension. I would vacate that portion of paragraph 5 of Order 1087 which denies completely this pension and remand with directions that the $10,000. per year special pension be paid to Mr. Symes for the period since June 21, 1970.
 
 
 41
 In all other respects, I concur in the majority opinion.
 
 
 
 [1]
 Symes, Greenough, Bevan, Saunders, Smucker and Perlman
 
 
 [2]
 The Plan for Supplemental Pensions is a funded retirement plan. Order No. 278 held that the trustees had no interest in the fund. Order No. 1087 authorizes the trustees to continue the Plan in existence, making the necessary employer contributions. There is no appeal from this feature of Order No. 1087
 
 
 [3]
 These include two supplementary benefit arrangements of the New York Central, and the New Haven pension plan which Penn Central assumed in the 1968 merger, an Interim or Early Retirement Plan designed to encourage attrition of the labor force, and additional pension benefits for prior service at other railroads. Order No. 1087 authorizes the trustees to continue these plans in effect and to make all payments necessary to implement them. There is no appeal from this feature of Order No. 1087
 
 
 [1]
 47 years and 3 months of continuous active service and approximately 6 additional years as a director prior to his retirement