In the Matter of **PENN CENTRAL TRANSPORTATION COMPANY**, Debtor.

Appeal of **GIRARD TRUST BANK** Nos. 73–1260, 73–1274 and 73–1276.

Appeal of **BANKERS TRUST COMPA-NY**, Nos. 73–1271, 73–1299 and 73–1414.

Appeal of **MANUFACTURERS HAN-OVER TRUST**, Nos. 73–1272, 73–1279 and 73–1415.

Appeal of The **FIDELITY BANK** Nos. 73–1272, 73–1279 and 73–1415.

Appeal of **IRVING TRUST COMPANY**, Nos. 73–1273, 73–1278 and 73–1286.

Appeal of **MORGAN GUARANTY TRUST COMPANY OF NEW YORK**, Nos. 73–1275, 73–1277 and 73–1287.

Nos. 73–1260, 73–1271 to 73–1279, 73–1286, 73–1287, 73–1299, 73–1414 and 73–1415.

United States Court of Appeals, Third Circuit.

Argued Oct. 26, 1973.

Decided Feb. 6, 1974.

Rosenn, Circuit Judge, concurred and filed opinion.

Irving Jaffe, Acting Asst. Atty. Gen., Robert E. J. Curran, U. S. Atty., Walter H. Fleischer, Irwin Goldbloom, James F. Dausch, Attys., Dept. of Justice, Washington, D. C., Robert W. Blanchette, Carl Helmetag, Jr., James E. Howard, Ivan Shomer, Philadelphia, Pa., for appellees-trustees.

John J. McAtee, Jr., Richard M. Berman, Dale L. Matschullat, Harvey A. Goldman, Davis, Polk & Wardwell, New York City, for Morgan Guaranty Trust Co. of New York.

Richardson Blair, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for Girard Trust Bank.

Stephen A. Weiner, Edward A. Christensen, Winthrop, Stimson, Putnam & Roberts, New York City, for Irving Co.

Edward Roberts, III, Kelley, Drye, Warren, Clark, Carr & Ellis, New York City, for Manufacturers Hanover Trust Co.

Donald M. Wilkinson, Jr., White & Case, New York City, for Bankers Trust Co.

Morgan, Lewis & Bockius, Philadelphia, Pa., for The Fidelity Bank.

Before McLAUGHLIN, GIBBONS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

This is an appeal, pursuant to Section 77(o) of the Bankruptcy Act, 11 U.S.C. § 205(o),[1] from five orders of the reorganization court authorizing the sale of separate properties of the debtor Penn Central Transportation Company. The orders resulted from four separate petitions by the trustees in reorganization. Each petition was prompted by the cash shortage projected by the trustees for the first quarter of 1973. The orders and the underlying petitions are summarized as follows:

### Order No. 1073

In a petition dated November 20, 1972 the trustees requested authority to grant, for $10,000, a six-month option to purchase, for $825,000, 4.399 acres of the debtor's subproductive nonrail real estate in Columbus, Ohio. The trustees proposed to use the net proceeds, after payment of back real estate taxes and expenses of sale, to reimburse the general operating funds of the debtor. Order No. 1073 granted the petition and allowed the trustees, in the event the option was exercised, to reimburse general operating funds "for additions and betterments previously or hereafter made on unmortgaged property owned by the Trustees." The Columbus, Ohio property is not subject to any mortgage indenture but is subject to the lien of the United States securing trustees certificates issued pursuant to reorganization court Order No. 124 and Section 3 of the Emergency Rail Services Act of 1970, 45 U.S.C. § 662. At the time of argument

of the appeal the option had not yet been exercised. The original option date had expired but had been extended. *See* Order No. 1330 (Sept. 28, 1973).

### Order No. 1103

In a petition dated December 11, 1972 the trustees requested authority to sell a note owned by the debtor and secured by a second mortgage on real estate in Philadelphia, Pennsylvania, on which stands the Penn Towers office and apartment building, and receive the proceeds for general operating expenses. The unpaid principal of this note on December 11, 1972 was $1,750,000 and there was unpaid interest in the amount of $971,250. The note is not subject to any mortgage indenture or similar security interest but is subject to the lien of the United States securing trustees certificates issued pursuant to Order No. 124 and Section 3 of the Emergency Rail Services Act of 1970. Order No. 1103 authorized the sale for $2,721,250 and ordered that the net proceeds "be deposited in a general cash account of the Trustees and devoted to the fullest extent possible to the payment of expenses, which if not met would preclude the continued provision of essential transportation services"; that is, to general operating expenses. At the time of argument of the appeal the closing on the sale of the note had not yet taken place.

### Orders No. 1087, 1088

In a petition dated December 26, 1972 the trustees requested authority to liquidate $10,000,000 in securities held by the debtor as a part of its Contingent Compensation Reserve Fund and to use the proceeds for general operating expenses. The Fund is not subject to any mortgage indenture or similar security interest,[2] but is subject to the lien of the United States securing trustees certifi-

1. "Any such order of the judge shall be a final order for the purposes of appeal." 11 U.S.C. § 205(o).

2. Several former employees who were participants in the Contingent Compensation Plan under which the Fund was established objected to the sale. Their objections were

considered by the court in In re Penn Central Transportation Co., 484 F.2d 1300 (3d Cir. 1973), cert. denied, Greenough v. Trustees of Penn Central Transportation Co., 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974). We held that the employees did not have a secured interest in the Fund.

cates issued pursuant to Order No. 124 and Section 3 of the Emergency Rail Services Act of 1970. Orders No. 1087 and 1088 authorized the liquidation of $7,400,000 in securities from the Fund and the use of the proceeds to "meet current operating expenses." At the time of argument of the appeal the Fund had been liquidated and the proceeds dissipated in the trustees' general operations.

### Order No. 1156

In a petition dated February 22, 1973 the trustees requested authority to sell 16.984 acres of nonrail real estate located in Toledo, Ohio for $134,173, and to use the net proceeds, after payment of selling expenses and back taxes, to reimburse their general operating funds. The Toledo, Ohio property was not subject to any mortgage indenture, but was subject to the lien of the United States for trustees certificates issued pursuant to Order No. 124 and Section 3 of the Emergency Rail Services Act of 1970. Order No. 1156 authorized the sale and provided that the proceeds "shall be kept in a special account and used by the Trustees to reimburse their general funds for additions and betterments previously or hereafter made on unmortgaged property owned by the Trustees." At the time of argument of the appeal the closing had taken place and the proceeds remained in the special account.

### Standing of the Appellants

The several mortgage indenture trustees represent the bulk of the debtor's prereorganization secured creditors. None of the property subject to the orders appealed from is covered by their indentures. All of the property subject to those orders, however, prior to the entry of those orders, secured the postreorganization trustees certificates. By virtue of Order No. 124's implementation of Section 77(c)(3) of the Bank-

ruptcy Act and Section 3(c) of the Emergency Rail Services Act of 1970, all the property subject to the mortgage indentures is also subject to the prior lien of the trustees certificates, as well as to the payment of other expenses of administration as priority claims. They urge that the sale of unmortgaged capital assets subject to the lien of the trustees certificates, without any application of the proceeds in reduction of that lien, results in an increase in the burden of prior secured debt to which the mortgaged properties securing their claims is subjected. Thus they are directly affected by the orders appealed from. They object to the sale of unmortgaged capital assets securing prior liens unless (1) the proceeds of sale are applied in reduction of those liens, or (2) under the equitable rule of marshaling the prior liens are reduced pro tanto, or (3) the court, before it permits expenditure of the proceeds, makes the findings required for a section 77(o) sale by Central Railroad Co. of New Jersey v. Manufacturers Hanover Trust Co., 421 F.2d 604 (3d Cir.), cert. denied, 398 U.S. 949, 90 S.Ct. 1867, 26 L.Ed.2d 289 (1970) (*Jersey Central*) and In re Third Avenue Transit Corp., 198 F.2d 703 (2d Cir. 1952) (*Third Avenue*).

### The Trustees' Position on Appealability

The trustees would prefer not to have the appeal decided. They urge that since the proceeds of sale under Orders No. 1073, 1103 and 1156 have not yet been spent we should treat these orders as nonfinal under 11 U.S.C. § 205(o). This would be a strained construction of that subsection. The subsection permits the judge to order a sale of assets "in the interest of the debtor's estate and of ultimate reorganization".[3] It goes on to provide "[a]ny such order of the judge shall be a final order for the purposes of appeal." There is no question but that each of the orders in issue is "such or-

---

3. There is no contention that these sales were not in the interest of ultimate reorganization. *Compare* this *with* In re Penn Central Transportation Co., 484 F.2d 323 (3d

Cir.), cert. denied, Signer v. Trustees of Property of Penn Central Transportation Co., 414 U.S. 1079, 94 S.Ct. 574, 38 L.Ed. 2d 471 (1973). (*Park Avenue Properties*).

der of the judge." The trustees suggest that the statutory language can be avoided by their tendered stipulation with respect to the proceeds of sale under Orders No. 1073, 1103 and 1156 that these proceeds will not be expended without a further order of the district court. Here, again, the internal structure of section 77(*o*) stands in the way of treating the orders as nonfinal, for after setting forth that "such order of the judge shall be a final order" the subsection goes on to provide:

"The proceeds derived from any such sales shall be received by the trustee . . . and shall be applied or disposed of in such manner as the judge by further order shall direct."

It is clear, therefore, that neither the fact that the proceeds under Orders No. 1073, 1103 and 1156 are unspent nor the fact that the trustees are willing to subject those proceeds to a further order of the reorganization court takes those orders out of the category of final orders reviewable under § 77(*o*).

■ The trustees position with respect to Orders No. 1087 and 1088 obviously is different, since the proceeds of sale of the securities in the Contingent Compensation Reserve Fund have been received and expended. Conceding that these orders are final, the trustees urge that we should nevertheless postpone decision on the issues raised by the appeal of the indenture trustees. They contend that we should not consider whether the proceeds should have been applied to reduce prior liens, whether the marshaling rule is applicable, or whether the debtor's capital assets should be restored pending appropriate *Jersey Central* or *Third Avenue* determinations, because these issues can be dealt with in a plan of reorganization. For authority the trustees rely on In re Penn Central Transportation Co., 484 F.2d 323 (3d Cir.), cert. denied, 414 U.S. 1079, 94 S.Ct. 598, 38 L.Ed.2d 485 (1973) *(Park Avenue Properties)*.

The trustees misapprehend the thrust of the decision relied on. In that case we affirmed the reorganization court's holding that income from pledged shares was available to the trustees and need not be paid over to the pledgee, but we prohibited the sale, pursuant to § 77(*o*), of the underlying properties. The fundamental attack in the *Park Avenue Properties* appeal was on the extent of the court's power under § 77(*o*), and that issue was decided, not postponed. The appeal did not present the issue of use of the proceeds, since we prohibited the sales. A plan of reorganization cannot restore assets lost to the estate in deficit operations.

■ Finally, the trustees urge that at least with respect to Orders No. 1073, 1103 and 1156, assuming appealability, we should superimpose on § 77(*o*) a ripeness doctrine, and in view of their tendered stipulation that they will not spend the proceeds of sale of properties covered by these orders without a further court order, decline to decide the appeal until such order is entered. Putting aside the question whether we could legally contract our statutory appellate jurisdiction by inventing a ripeness doctrine, there is no reason for doing so in this case. If the district court did not believe the proceeds of sale could be used as proposed, it might not have authorized the sale at all. While the mortgagee appellants may be happy to have the lien of the trustees certificates secured by cash proceeds rather than by real estate or securities, the trustees may feel that if they cannot use the proceeds of sale of these real estate assets the sale is not provident at this time. Moreover, any analytical justification for contracting a grant of appellate jurisdiction by the invention of a ripeness doctrine must be found in some principle of appellate self-protection which avoids the necessity for pronouncing the law prematurely or unnecessarily. Since we must in any event review Orders No. 1087 and 1088, no self-protective principle is operative here. Rather we would be deciding, unnecessarily and prematurely, that the grant of appellate juris-

diction in § 77(*o*) could be limited by a ripeness doctrine.

In sum, we see no legitimate route by which we can avoid decision of the issues tendered by this appeal. That, incidentally, is the position on appealability of the United States as appellee.

### The United States Position on the Merits

The United States acknowledges that by resorting to first lien trustees certificates the trustees operating a railroad in reorganization can accomplish a substantial diminution of the security of the railroad's secured creditors, but urges

(1) that such result violates neither section 77 nor the fifth amendment,

(2) that its first lien is not, under the Emergency Rail Services Act of 1970, subject to the marshaling rule, and that the marshaling rule is not constitutionally required, and

(3) that the principles of the *Jersey Central* and *Third Avenue* cases are applicable only to property mortgaged by the debtor to the protesting creditor.

Chief reliance for these positions is placed upon the Penn-Central Merger Cases, 389 U.S. 486, 88 S.Ct. 602, 19 L. Ed.2d 723 (1968) and the New Haven Inclusion Cases, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970).

### The Trustees' Position on the Merits

The trustees' position, while stated in terms of a reasonable exercise of the reorganization court's discretion, is essentially the same as that of the United States.

### The *Third Avenue-Jersey Central* Rules

■ In exercising the power granted by § 77(*o*) to convert capital assets to cash the reorganization court must act within the bounds of the fifth amend-ment; that is, the court may not by the device of a § 77(*o*) sale authorize an unconstitutional taking of property of mortgage bondholders. The outer limits of constitutionality have been suggested in two tests, applicable in different circumstances. We have endorsed the test laid down in In re Third Avenue Transit Corp., 198 F.2d 703 (2d Cir. 1952).[4] We have also endorsed the test laid down in In re New York, New Haven & Hartford Railroad, No. 30226 (D.Conn. December 7, 1961) and stated for this court in Central Railroad Co. of New Jersey v. Manufacturers Hanover Trust Co., *supra*. See In re Penn Central Transportation Co., 474 F.2d 832, 835–836 (3d Cir. 1973) ( *Selkirk Yard*). These cases restrict the application of proceeds of a § 77(*o*) sale in order to protect mortgage bondholders. They provide the standards which the reorganization court must apply in ordering application or disposition of § 77(*o*) sale proceeds.

*Third Avenue* concerned subsidizing operations by the use of proceeds held by the indenture trustee from the sale of mortgaged assets. To protect secured creditors from being forced unconstitutionally to invest their liquid security in a bankrupt enterprise, the Court held:

"But we believe that the power should never be exercised absent findings, based on the clearest evidence, not only that it is imperative to obtain the funds and that they cannot be obtained, on reasonable terms, first, by bank loans or second, by the disposal of certificates under Section 116, sub. 2, through ordinary market channels to voluntary lenders, but also that there is a high degree of likelihood (a) that the debtor can be reorganized in accordance with the Act, within a reasonable time, and (b) that the secured creditors whose security is being compulsorily loaned will not be injured. The reorganization trustees

---

4. *Third Avenue* was actually a Chapter X rather than a § 77 reorganization, but the fifth amendment is equally applicable to both proceedings, and in *Jersey Central* we have considered *Third Avenue* to be applicable in railroad reorganizations.

here had the burden of proving all these matters." 198 F.2d at 706–707 (footnotes omitted).

No one contends that the trustees could have obtained funds for operating purposes through ordinary market channels. Thus we can assume that the unavailability feature of the *Third Avenue* test has been met. The remaining mandatory findings, (a) a high degree of likelihood of reorganization within a reasonable time, and (b) a high degree of likelihood that secured creditors will not be injured, were not made by the reorganization court with respect to any of the orders appealed from. Indeed on the record before the reorganization court no such findings could have been made. Orders No. 1103, 1087 and 1088 all provided that the proceeds of sale could be expended for the railroad's general operations. Thus if the *Third Avenue* test applies to them, the requisite findings have not been made and the orders would be invalid.

■■ In *Jersey Central* we said that a less strict set of findings were required when the proceeds of a sale or prior encumbrance of mortgaged assets were to be used to make additions and betterments to properties covered by the mortgage rather than expended in operations.

" 'The rule for a reorganization under Sec. 77 * * * is that [1] in addition to finding that the funds are presently needed and cannot be obtained elsewhere [2] the court need only conclude that reorganization is probably feasible, [3] that the money drawn-down and expended for additions and betterments will materially contribute to the possibility of successful reorganization and to the continuation of the transportation plant, or a substantial part thereof, as a going concern, and [4] that the interests of the bondholders are not thereby prejudiced.' " 421 F.2d at 606.

The chief difference between the two tests is that if additions and betterments are to be made to the mortgaged property (*Jersey Central*) the reorganization court need only find that reorganization is probably feasible, while if the proceeds of the draw-down are to be expended other than for additions and betterments to the mortgaged properties (*Third Avenue*), it must find a high degree of likelihood that the debtor can be reorganized in a reasonable time. Both tests require findings that the mortgagees not, by the expenditure, be prejudiced. The finding of lack of prejudice under *Jersey Central* involves a determination that the plant subject to the superior lien is worth no less after the additions and betterments than before the sale and reinvestment. A finding of lack of prejudice under *Third Avenue* involves a firm prediction that in a capitalized earnings plan of reorganization or in liquidation the plant subject to the mortgage will be valued so as to pay the secured creditor at least as much as if the lien of the trustees certificates had not been imposed.

Orders No. 1073 and 1156 provide that the proceeds may be used to reimburse general operating funds "for additions and betterments previously or hereafter made on unmortgaged property." The quoted language would seem, on the surface, to take these orders out of the less stringent *Jersey Central* test, and put them within *Third Avenue*, assuming either test applies. Arguably, however, since the appellants' standing depends upon the effect on their security of releasing unmortaged assets from the lien of the trustees certificates, no more should be required to put these orders within *Jersey Central* than expenditures for additions and betterments subject to that lien. In any event, no *Jersey Central* findings were made with respect to either order.

### The Marshaling Rule

■■ The lien securing the government's guarantee of the trustees certificates is a first lien on all the debtor's assets, mortgaged and unmortgaged alike. The government's position vis-à-vis the beneficiaries of the mortgage in-

dentures is that of superior lienholder and junior encumbrancer, with the superior lienholder having other security. Such a situation ordinarily brings into operation the equitable rule that the superior lienholder may not release the other security and thereby prejudice the junior encumbrancer. One court has stated the rule thus:

> "Under established equitable principles, the junior encumbrancer is entitled to have the proceeds of the sale of mortgaged property applied upon the senior indebtedness, whether the property sold was covered by the mortgage or not. And if the senior mortgagee, with actual knowledge of the junior encumbrance voluntarily releases a portion of its security to the prejudice of the junior encumbrancer without releasing a proportionate part of its debt, it is accountable to the junior encumbrancer for the value of the released security." Continental Supply Co. v. Marshall, 152 F.2d 300, 308 (10th Cir. 1945), cert. denied, 327 U. S. 803, 66 S.Ct. 962, 90 L.Ed. 1028 (1946).

The government contends that any duty it might have had toward junior encumbrancers by virtue of its position as a superior lienholder was eliminated by § 3(c) of the Emergency Rail Services Act of 1970, 45 U.S.C. § 662(c), which provides:

> "The Secretary shall not guarantee any certificate unless the certificate is treated as an expense of administration and receive the highest lien on the railroad's property and priority in payment under the Bankruptcy Act."

The government also relies upon § 3(b) of that Act:

> "As a condition to a guarantee, the Secretary, after consultation with the Commission, shall require that:
>
> (1) the proceeds of the sale of certificates guaranteed under this chapter will be used solely for meeting payroll and other expenses which, if not met, would preclude continued provision of essential transportation services by the railroad;
>
> . . . . . .
>
> (3) proceeds from the sale of assets will be devoted to the fullest extent possible to the provision of essential transportation services by the railroad; . . . "

Under the government's interpretation of the Act it, as a superior lienholder, is required to permit the sale of all of the debtor's unmortgaged capital assets and the application of the proceeds thereof for deficit operation of the railroad even if this means that junior encumbrancers must ultimately bear the entire cost of the trustees certificates. The appellants urge that Congress never intended such a result. Rather, they urge, the Emergency Rail Services Act of 1970, properly construed, (a) requires proper *Third Avenue* findings prior to the resort to government-assisted borrowing, and (b) makes no change in the duty of the superior lienholder toward junior encumbrancers. Any other construction, they urge, would run afoul of the fifth amendment taking clause.

### The Economic Effect of the Orders

Because the government's guarantee of the trustees certificates is secured by a first lien on all the debtor's assets, mortgaged as well as unmortgaged, the effect of the sale of unmortgaged assets and the expenditure of the proceeds thereof, unless the marshaling rule applies, is to increase the burden of the government's lien on the mortgaged assets. This is identical in economic effect to the issuance of new trustees certificates secured by a prior lien on the mortgaged assets and the expenditure of the proceeds in the operation of the debtor's business or for additions and betterments. When such trustees certificates were issued in this case the reorganization court assumed that the constitutional prohibition against uncompensated takings applied and that findings similar to those required by *Third Avenue* and *Jersey Central* must be made. *See* In re Penn Central Trans-

portation Co., 325 F.Supp. 302, 304 (E. D.Pa.1971). Looking to fact rather than to form, then, the same fundamental constitutional prohibition against uncompensated takings should apply.[5] If, as the government contends, the *New Haven Inclusion Cases* authorize a different result, then these cases must be deemed to have overruled *Third Avenue* and *Jersey Central*.[6] Certainly we did not think that *Third Avenue* and *Jersey Central* lacked current authority when we decided In re Penn Central Transportation Co. (*Selkirk Yard*), *supra*, or In re Penn Central Transportation Co., 468 F.2d 1222 (3d Cir. 1972) (*Mortgage Releases*). In the *Selkirk Yard* case we found that the reorganization court had correctly applied the *Jersey Central* test. Thus technically we were not called upon to consider whether it had been overruled by the *New Haven Inclusion Cases*. In the *Mortgage Releases* case, however, we held that *Jersey Central* findings were required before a mortgagee could be compelled to release mortgaged property in exchange for additions and betterments.

## The Fifth Amendment Minimum Requirements

■ In Brooks-Scanlon Co. v. Railroad Commission, 251 U.S. 396, 40 S.Ct. 183, 64 L.Ed. 323 (1920) the Court unanimously invalidated an order of a state railroad commission which required an intrastate railroad to continue operation on specified schedules at a loss. So long as the railroad repudiated its railroad charter and common carrier business, the Court held, the owners had a right to withdraw their capital from a losing venture. In Railroad Commission v. Eastern Texas Railroad, 264 U.S. 79, 85, 44 S.Ct. 247, 249, 68 L.Ed. 569 (1924), again in a state regulatory context, the Court affirmed the *Brooks-Scanlon* rule stating:

"The company, although devoting its property to the use of the public, does not do so irrevocably or absolutely, but on condition that the public shall supply sufficient traffic on a reasonable rate basis to yield a fair return. And if at any time it develops with reasonable certainty that future operation must be at a loss, the company may discontinue operation and get what it can out of the property by dismantling the road. *To compel it to go on at a loss or to give up the salvage value would be to take its property without the just compensation which is a part of due process of law.*" (Emphasis added)

*See also* Bullock v. Florida ex rel. Railroad Commission, 254 U.S. 513, 521, 41 S.Ct. 193, 65 L.Ed. 380 (1921). The *Brooks-Scanlon, Eastern Texas* and *Bullock* cases all arose in a fourteenth amendment context since all involved state rather than federal action. But they are applicable, a fortiori, to federal action, assuming they have not been overruled, since the fifth amendment, unlike the fourteenth, contains an express prohibition against unconstitutional takings. Congressional power under either the bankruptcy clause or the commerce clause is limited by the fifth amendment. *See* Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 589–590, 55 S.Ct. 854, 79 L.Ed. 1593 (1935), holding that the 1934 Frazier-Lemke Act was unconstitutional because its farm mortgage moratorium provisions did not protect mortgagees from erosion of their security by the accumulation of prior tax liens. Recognizing that the fifth amendment applied, in Continental Illinois National Bank & Trust Co. v. Chicago R.I. & P.Ry., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110 (1935), the Court held that postponement of creditor remedies pending a reorganization was not the equivalent of

---

5. *See* note 7 *infra*. A creditor who is fully secured may, of course, lack standing to assert an injury to stockholders or less secure creditors.

6. *Jersey Central* was decided in January 1970. The *New Haven Inclusion Cases* were not decided until June 29, 1970.

an unconstitutional taking, so long as the postponement did not impair the pledgees' liens or otherwise depreciate their security. Since the security was worth three times the amount of the pledgees' notes, the postponement of their recovery until a plan of reorganization was not a violation of the taking clause.[7]

*Third Avenue* and *Jersey Central* represent efforts by reorganization courts to draw the line between mere postponement, permitted by Continental Illinois National Bank & Trust Co. v. Chicago R.I. & P. Ry., *supra*, and erosion of security which amounts to a taking and is forbidden by Louisville Joint Stock Land Bank v. Radford, *supra*, and the fourteenth amendment cases such as *Brooks-Scanlon*. They spell out the findings which must be made to insure that the reorganization court is not engaged in an intentional uncompensated taking.[8] In the *Selkirk Yard* and the *Mortgage Releases* cases we recognized that those findings were required in the Penn Central reorganization.

The government, and to a lesser extent the trustees, urge that the *Brooks-Scanlon-Louisville Joint Stock Land Bank-Third Avenue-Jersey Central* learning is obsolete because in the *Penn-Central Merger Cases* and *New Haven Inclusion Cases* the Court laid down a new principle of constitutional law. That new principle, they urge, is that secured investors in a railroad enterprise take on obligations in relation to the public which makes it appropriate that they run such risk of erosion of their investment as is necessary in the public interest in order to preserve railroad service. Neither appellee suggests the precise contours of what is claimed to be the new constitutional rule. The government, however, points out that in the New Haven reorganization erosion of the interests of secured creditors amounted to $70 million while the railroad was waiting to be included in the Penn-Central merger. *See* New Haven Inclusion Cases, 399 U.S. at 490, 90 S. Ct. 2054, 26 L.Ed.2d 691. We know, with the benefit of hindsight, that since 1968 the New Haven bondholders have fared even worse. If the results of the New Haven reorganization determine the constitutional limitations of a reorganization court's power to subject mortgaged assets to erosion, there may be no limitation whatsoever. We turn, then, to a consideration of the two cases on which appellees rely. To put them in context some understanding of the background of the New Haven reorganization is required.

When the New Haven petition was filed on July 7, 1961 the railroad had incurred, in a period of relatively high economic activity, net operating losses in 1958, 1959, 1960, 1961 and the first half of 1962. Since these losses had occurred in a period of prosperity it could not look forward to an economic turnaround which would, as in the earlier reorganization, begin to produce a net operating income with which to meet fixed charges. Section 77(b) provides:

"A plan of reorganization within the meaning of this section . . . (4) shall provide for fixed charges (including fixed interest on funded debt,

---

7. In January 1971 when issuance of the trustees certificates was authorized, the reorganization court made the findings which the fifth amendment taking clause requires. In re Penn Central Transportation Co., 325 F.Supp. 302 (E.D.Pa.1971). There is in In re Prima Co., 88 F.2d 785 (7th Cir. 1937), extravagant language suggesting that because the bankruptcy power is vested in Congress by the Constitution, under former § 77B and under § 77(c)(3), 11 U.S.C. § 205(c)(3), first lien certificates can be issued without regard to the taking clause.

*The Prima* opinion writer, however, makes no mention of either Continental Illinois National Bank & Trust Co. v. Chicago R.I. & P. Ry., *supra*, or Louisville Joint Stock Land Bank v. Radford, *supra*, and on the facts no taking was involved. We do not regard the *Prima* discussion as authoritative.

8. As our discussion of the New Haven reorganization, *infra*, suggests, the *Third Avenue* and *Jersey Central* rules provide no guarantee against creditor loss, but only against an intentional uncompensated taking.

interest on unfunded debt, amortization of discount on funded debt, and rent for leased railroads) in such an amount that, after due consideration of the probable prospective earnings of the property in light of its earnings experience and all other relevant facts, there shall be adequate coverage of such fixed charges by the probable earnings available for the payment thereof; . . ."

There were no earnings, and no prospect of any, at any time during the New Haven reorganization. There was never, therefore, any prospect for a capitalized earnings reorganization. The alternatives were liquidation, nationalization, or merger. *See* In re New York, N.H. & H.R.R., 289 F.Supp. 451, 456 (D.Conn. 1968). Nationalization was not forthcoming. Merger of a single New England system was explored. In March of 1962, when the Pennsylvania Railroad and the New York Central Railroad filed a merger application with the Interstate Commerce Commission the trustees intervened and asked to be included. Merger was anticipated as early as March 5, 1962. *See* In re New York, N.H. & H.R.R., Six Months Interim Report of the Trustees (March 5, 1962), 2 New Haven Proceedings 700–(1), 700–(30–31). By late 1963 it was clear that inclusion in the Penn-Central merger or liquidation were the only courses open to the reorganization court. *See* In re New York, N.H. & H.R.R., 304 F.Supp. 793, 800 (D.Conn.1969). The ICC, which under § 77(d) had responsibility for formulating and certifying a plan of reorganization, recommended inclusion rather than a dismissal of the proceedings which would have resulted in liquidation. Once that decision was made the questions facing the reorganization court were (1) how much were the New Haven assets worth, and (2) as of what date would they be valued. Judge Anderson throughout the proceedings made it clear that he was attempting to balance the considerations favoring postponement of creditors' remedies dis-

cussed in Continental Illinois National Bank & Trust Co. v. Chicago R.I. & P. Ry., *supra*, against those preventing intentional erosion discussed in *Third Avenue*. *See e.g.*, In re New York, N.H. & H.R.R., 289 F.Supp. 451, 459 (D. Conn.1968). What he attempted was a preservation for the creditors of "fair liquidation value." This value was ascertained by determining what the creditors would have realized upon liquidation, taking into account that liquidation of an enterprise as large as the New Haven could not have been accomplished except over a long period. As Judge Anderson put it:

"[T]he term 'fair liquidation value' has been used in the present case to describe a method or theory of determining value. It envisioned sales of New Haven property over a period of six years and of economic factors related to the business of turning the properties into cash." In re New York, N.H. & H.R.R., 304 F.Supp. at 805.

The *New Haven* reorganization court, in other words, considered that it was applying, rather than rejecting the holding of *Brooks-Scanlon, Eastern Texas* and *Third Avenue*. See, e.g., 304 F. Supp. at 804.

In the Penn-Central Merger Cases, 389 U.S. at 507–511, 88 S.Ct. 602, 19 L. Ed.2d 723, the Supreme Court considered a New Haven bondholder's objection to the terms of an ICC order, approved by the reorganization court, providing for inclusion of the New Haven in the Penn-Central merger at an asset value of $125,000,000, for interim loans from Penn Central to the New Haven trustees, and for Penn Central to bear certain New Haven operating losses. The bondholders contended that the interim arrangement did not sufficiently protect them because it did not require that Penn Central absorb all New Haven operating losses. The Court rejected the bondholders' appeal. It pointed out that "[t]he merits of these provisions [of the

ICC order] are not before us." *Id.* at 509, 88 S.Ct. at 614. It went on to say:

> "While we reject the appeals of the NH bondholders, acceptance or rejection of the terms and conditions on behalf of the NH remains to be determined. The bondholders' objections may be registered and adjudicated in the bankruptcy court or upon judicial review as provided by law." *Id.* at 511, 88 S.Ct. at 614.

*Penn-Central Merger Cases, supra,* clearly cannot be construed as a rejection of *Brooks-Scanlon, Eastern Texas* or *Third Avenue.* On the contrary, it approved of an immediate interim consumation of a merger which was to accomplish an application of Judge Anderson's "fair liquidation value" approach. It left open the question whether the interim arrangement approved by the ICC adequately protected the bondholders from erosion, but it assumed that such protection was required.

Protracted valuation proceedings followed in two separate tribunals. These were reviewed in 1970 in the *New Haven Inclusion Cases, supra,* decided eight days after the filing of the petition which commenced the instant reorganization. Critical to an understanding of the *New Haven Inclusion Cases* are (1) the fact that the merger between New Haven and Penn Central had been consummated on February 1, 1968, and (2) the fact that the case only involves how much Penn Central, an unwilling purchaser, would be forced to pay as the "fair liquidation value" of assets which it acquired before the price was finally fixed. Since valuation litigation had proceeded simultaneously both in the reorganization court pursuant to § 77 of the Bankruptcy Act, and before a three-judge district court pursuant to § 5 of the Interstate Commerce Commission Act, the Supreme Court's first task was to determine which court had jurisdiction to make the determination. It decided that the three-judge court should have deferred to the reorganization court, 399 U.S. at 430, 90 S. Ct. 2054, 26 L.Ed.2d 691, and that the

reorganization court could properly review the valuation of the New Haven assets made by the ICC. Significantly, both the ICC and the Supreme Court accepted the reorganization court's liquidation approach to valuation.

> "As the Commission described it, 'Liquidation value as used by both the N[ew] H[aven] trustees and Penn-Central [was] the estimated market value that would be realized in a total liquidation, less the cost of dismantling the property and other liquidation costs and after discounting proceeds to present worth.' 331 I.C.C., at 697." 399 U.S. at 436, 90 S.Ct. at 2081.

> "Consistent with the liquidation hypothesis, both New Haven and Penn Central deducted from the gross value of the New Haven assets the expenses that would be incurred if a liquidation in fact took place." *Id.* at 437, 90 S.Ct. at 2081.

> "The Commission concluded that once the New Haven estate embarked on a liquidation sale . . . 'the bulk of the liquidation could be completed within a period of 6 years.' 331 I.C.C., at 663." *Id.* at 437–438, 90 S.Ct. at 2082.

The lengthy discussion of valuation in the opinion of the Court in the *New Haven Inclusion Cases* is premised on the underlying assumption that the New Haven creditors were entitled to liquidation value, subject to a deduction for those expenses which would necessarily have been incurred during a liquidation. The Court wrote:

> "The purchase price that the Commission and the reorganization court have required Penn Central to pay to the New Haven estate is based upon the liquidation value of the seller's assets, appraised as of December 31, 1966. That price hypothesizes a shutdown of New Haven followed by a sell-off of its assets at their highest and best value. In the circumstances of this case, and for the reasons we have already set out at length, we

agree with the reorganization court that it would be unfair and inequitable to allow Penn Central to take the properties for any lesser sum. Moreover, we today require a reassessment of the consideration that Penn Central is to give in exchange for those properties. *We thereby accord the bondholders the right to a liquidation and a per-parcel sale that is theirs by virtue of their mortgage liens." Id.* at 489–490, 90 S.Ct. at 2108 (emphasis added).

The government and the trustees point to the disallowance by the Supreme Court of $70,000,000 in pre-1968 New Haven administrative expenses and of depreciation during the same period as costs to Penn Central. But the Supreme Court pointed out that until well after the 1966 valuation date the bondholders had acquiesced in continuing the proceedings rather than moving for liquidation. *Id.* at 493, 90 S.Ct. 2054, 26 L.Ed. 2d 691. The constitutionality of the erosion which had taken place prior to the valuation date was never presented to the court in any proceeding in which it could have passed upon that issue. The *New Haven Inclusion Cases* decide no more than that Penn Central does not have to pay for erosion which took place prior to its purchase of the assets.

With the benefit of hindsight it can be said that the New Haven bondholders have not fared as well as they would have had Judge Anderson dismissed the proceedings and commenced a liquidation in 1961. But judicial proceedings often produce less than perfect results even when settled legal principles are applied. The erosion which took place in the New Haven reorganization did not occur because either the reorganization court or the Supreme Court considered that a new interpretation of the fifth amendment was being announced. Rather the reorganization court acting slowly, but with the concurrence of the bondholders, sought a purchaser which would pay creditors what *Brooks-Scanlon, Eastern Texas* and *Third Avenue* required. The Supreme Court merely approved the reorganization court's application of settled fifth amendment law. Nothing more was presented to it in either of the cases relied on by the government and the trustees. Neither the *Penn-Central Merger Cases* nor the *New Haven Inclusion Cases* cast doubt upon the continued viability of the *Third Avenue* and *Jersey Central* rules.

### Pending Legislative Proposals

The appellees suggest that we can take judicial notice of proposed legislative solutions for the northeast rail transportation crisis which at the time of argument were under active consideration in Congress and have since been enacted. They suggest, further, that such judicial notice can serve as a substitute for the findings required by the *Third Avenue* and *Jersey Central* rules. We do take judicial notice that legislative solutions were under active consideration, and have now been enacted.[9] We

9. The Regional Rail Reorganization Act of 1973, Pub.L.No. 93–236, 87 Stat. 985, enacted January 2, 1974, establishes the United States Railway Association whose duty is to prepare a final plan for acquiring and distributing some of the assets of each bankrupt northeast railroad permitted by its reorganization court to participate. If a reorganization court finds the Act does not provide a process which would be fair and equitable to the estate of the railroad, it may either attempt a separate reorganization under § 77 if it finds the railroad is reorganizable on an income basis, or dismiss the reorganization proceeding. Assuming that the Act withstands constitutional scrutiny, *see, e. g.*, N.Y. Times, Jan. 25, 1974, p. 43, cols. 5–7 (New Haven trustees' suit challenging the Act), and that the procedure contemplated is not interrupted, the transfer of assets would take place approximately 510 days after enactment. Loans and emergency grants are available, but there is no indemnification against interim losses. Section 303(c) of the Act contemplates that no more shall be paid in compensation than is "fair and equitable", which is defined as the minimum constitutionally required. In determining whether to participate in the proceedings under the Act, the reorganization court will have to be cognizant of the limitations imposed by the fifth amendment. Unless adequate protection against interim losses can be obtained either in the form of emergency grants, loans under which the Association bears the risk and

also take notice that it is highly likely that some form of rail transportation system, publicly or privately owned, will almost certainly survive even if the present proceedings under § 77 are dismissed. But such judicial notice cannot serve to enlarge the power of the reorganization court and the ICC to subject the property of secured creditors to a taking while, like Mr. Micawber, they wait for something to turn up. Congress, in devising a legislative solution, will be bound by the fifth amendment to pay the fair value of the Penn Central properties at the time any new rail transportation entity takes them. Any amount beyond that value, which would compensate secured creditors for the erosion which took place while the reorganization court and the ICC waited for a congressional solution, would be a matter of legislative grace. It would be hazardous, indeed, to speculate on the likelihood of favorable exercise of such largess from public funds, especially in view of the form of the legislation recently enacted.[10] Moreover the *Third Avenue* and *Jersey Central* rules are predicated upon the feasibility of a reorganization under the present statutes; that is, an earnings-based reorganization. *See* Bankruptcy Act, § 77(b), 11 U.S.C. § 205(b). If, as some of the reports filed by the trustees suggest, it is already clear that such a reorganization is not feasible,[11] then this reorganization is already at the point where the erosion of the estate in deficit operations must cease and a liquidation alternative must be considered if the secured creditors or other interested parties insist upon such consideration. Unlike the secured creditors in the earlier stages of the New

Haven reorganization, appellants do insist that at least they be heard on the issue with respect to the orders appealed from.

If the marshaling rule is applied and the government's lien reduced to the extent that it has consented to expenditures of the proceeds of sale of unmortgaged capital assets in the manner provided in the orders appealed from, then the problem of an unconstitutional taking from the bondholders by virtue of those orders disappears. The Emergency Rail Services Act does not expressly forbid application of that rule to the government's lien. That Act provides that "proceeds from the sale of assets will be devoted *to the fullest extent possible* to the provision of essential transportation services by the railroad." 45 U.S.C. § 662(b)(3) (emphasis added). A reasonable construction of the statute is that "to the fullest extent possible" means to the extent permitted by the fifth amendment in striking the balance, under § 77, between secured creditors and the public.[12] That balance, at some point, prohibits further erosion of the mortgaged estate, and therefore requires application of the marshaling rule if the reorganization court finds that the government has consented to the expenditure of its unmortgaged security in the deficit operation of the railroad. Under this construction of the Emergency Rail Services Act of 1970 it is up to the government to determine, as the reorganization proceeds to what extent it consents to the erosion of its security, by virtue of the marshaling rule, while it waits for the realization of a legislative solution.[13] As to the proceeds already spent the district court has not yet de-

burden of loss at least ahead of secured creditors, or constitutionally compelled compensation under the final plan, it may be necessary to dismiss the reorganization.

10. *See* note 9 *supra*.

11. *See, e.g.*, Trustees' Interim Report of February 1, 1973; Memorandum accompanying July 2, 1973 Plan of Reorganization of the Penn Central Transportation Company and Other Railroad Corporations (June 29, 1973).

12. When it originally approved sale of the trustees certificates in January 1971, the reorganization court observed that the § 662(b)(3) qualification "to the fullest extent possible" was a congressional recognition of this constitutional limitation. 325 F.Supp. at 306.

13. Rights of unsecured creditors and stockholders in the unmortgaged assets are not before us on this appeal. Nor does the appeal present the issue whether erosion pro-

termined whether the government consented to the expenditures. If it finds such a consent, the marshaling rule will apply. If it finds no such consent, it must determine in the first instance what other method of restoring the fund, if any, is feasible in the circumstances.

## Conclusion

 The orders appealed from will be reversed to the extent that they permit the expenditure of proceeds of sale of unmortgaged capital assets of the debtor for general operations of the debtor or for reimbursement of operating funds for past or future additions or betterments to unmortgaged assets. The orders will be remanded to the district court for further proceedings consistent with this opinion.

ROSENN, Circuit Judge (concurring).

I concur with the majority but I believe that two steps in the majority's analysis require further amplification.

I understand the reasoning of the majority to be as follows. *Jersey Central* and *Third Avenue,* which restrict the use of proceeds received from the sale of mortgaged assets, survive the *New Haven Inclusion Cases.* Because of the prior Government lien in the form of Trustees' Certificates, *Jersey Central*

and *Third Avenue* are applicable here even though the secured parties do not have a direct secured interest in the assets being sold. The findings which are required by *Jersey Central* and *Third Avenue* were not made, and apparently could not have been made, by the reorganization court. Since *Jersey Central* and *Third Avenue* define constitutional standards, marshaling is required in order to avoid an uncompensated taking of the secured parties' property whenever any proceeds are to be used for operating expenses or additions and betterments in the absence of the required findings. Furthermore, the Emergency Rail Services Act is consistent with the marshaling rule whenever that rule is constitutionally required.

I. Applicability of *Jersey Central* and *Third Avenue*

The Trustees argue that even if *Jersey Central* and *Third Avenue* are still good law, the two cases do not apply to the present situation because the assets sold were unmortgaged. The majority holds these cases nevertheless applicable on the theory that the sale of the unmortgaged assets without providing protection for the secured parties is the equivalent of the issuance of additional Trustees' Certificates.[1] "Looking to fact rather than to form," the majority asserts that since findings would be a

---

hibited by Louisville Joint Stock Land Bank v. Radford, *supra*, is taking place solely by virtue of the accrual of unpaid administration expenses such as state taxes due to prolongation of the reorganization.

1. A numerical example might help to clarify this point. All asset values are in terms of what a sale would ultimately bring on liquidation.

Assume total assets of the debtor are worth 25 hypothetical units, the prior Government lien on all assets is in the amount of 15 units, and the secured parties have mortgages in the amount of 10 units on assets worth 10 units. Fifteen units of unmortgaged assets therefore remain. On liquidation, the Government will receive its 15 units from the unmortgaged assets, while the secured parties will receive their 10 units from the mortgaged assets.

If the debtor were to sell unmortgaged assets worth 5 units and dissipate the proceeds in operating losses, on liquidation the unmortgaged assets would be worth 10 units while the Government lien would still be in the amount of 15 units. If, instead, the debtor were to borrow 5 units from the Government in exchange for the issuance of additional Trustees' Certificates in the same amount, and the proceeds were dissipated in operating losses, on liquidation the unmortgaged assets would be worth 15 units while the Government lien would be in the amount of 20 units.

In either case, therefore, since the Government lien receives first priority even on the mortgaged property, the secured parties lose 5 units of their security to the Government and receive only the 5 units remaining after full satisfaction of the Government lien.

necessary prerequisite to the issuance of additional Trustees' Certificates, the same findings should be required here. The majority apparently concludes that *Jersey Central* or *Third Avenue* findings must be made before any property subject to the Government lien may be sold and the proceeds used for operating expenses or for additions and betterments.

This "fact" over "form" analysis, however, depends upon the possibility of an eventual "spillover" of the prior Government lien from the unsecured assets to the secured assets in the event that the unsecured assets prove insufficient to satisfy the lien on liquidation. A situation may arise in the future in which sufficient *unsecured* assets to satisfy the prior Government lien would clearly remain after a proposed sale of unsecured assets had taken place. In such a situation, the existence of the prior Government lien would have no effect upon the secured interests,[2] and I believe the proposed sale could then be treated exactly as would a proposed sale of unmortgaged property in the absence of the Government lien. The secured parties would have only an interest common to all general unsecured creditors in the sale of the unmortgaged asset in question, and would have no special right to require that *Jersey Central* or *Third Avenue* findings be made before the unmortgaged property could be sold. The reorganization court in the instant case, however, made no findings that the remaining unsecured assets were adequate to satisfy the prior Government lien and to protect the secured parties from injury resulting from possible future erosion of unsecured assets.

## II. Scope of *Jersey Central* and *Third Avenue*

I do not believe that the foregoing analysis conclusively determines that *Jersey Central* or *Third Avenue* findings were required in this case, however, as to the use of proceeds from the sale of securities formerly a part of the Contingent Compensation Reserve Fund (Orders 1087 and 1088). The Trustees argue, in effect, that the securities making up the Fund do not constitute the kind of "asset" to which *Jersey Central* or *Third Avenue* apply; the Fund was simply a reserve which the company voluntarily set aside to meet future ordinary expenses, namely, the payment of retirement benefits. As such, they contend, it was similar to a bank account.

In fact, this court recently held, in an opinion by Judge Gibbons, that the Contingent Compensation Plan involved here was merely an executory contract calling for the payment of future retirement benefits, and the Fund was held as a part of the company's general assets subject to whatever use and disposition the company desired. In Re Penn Central Transportation Company, 484 F.2d 1300, 1305 (3d Cir. 1973), cert. den. Greenough v. Trustees of Penn Central Transportation Co., 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974).

It is not sufficient to say, as does the majority, that *Jersey Central* or *Third Avenue* findings are required merely because the Government lien concededly attaches to the Fund. If that were the only prerequisite to the requirement that findings be made, findings would be required before *any* property to which the Government lien attached could be used for operating expenses.

In permitting the issuance of the Trustees' Certificates initially, the reorganization court ordered that the Government lien attach to

> all the property, real, personal, and mixed, and the earnings and income thereof, now owned or hereafter ac-

---

2. In the numerical example in note 1, *supra*, if the initial assets were worth at least 30 units, and if 5 units of cash were raised by either method and the proceeds dissipated in losses, then the secured parties will nevertheless receive their full 10 units from the mortgaged assets. Of course, because of the considerable uncertainties inherent in a reorganization procedure, the secured parties could be treated as having the interest of general creditors in the unmortgaged property only if the assets were initially worth considerably more than 30.

quired by the Trustees as such, said charge and direct first lien to be prior in right to . . . the liens of each and every mortgage created by [the Penn Central Transportation Company].

In Re Penn Central Transportation Company, E.D.Pa. No. 70–347 (January 13, 1971). This provision appears on its face to cover all assets whatsoever, including bank accounts.[3]

The majority, as well as the secured parties, would surely not go so far as to contend that just because the Government lien attaches to cash on hand and bank accounts, that such accounts could not be used for operating expenses. Such a holding would of course prevent payment of essential expenses such as wages, salaries, and necessary supplies, and require immediate liquidation of the debtor whenever *Jersey Central* or *Third Avenue* findings could not be made.

I raise this point only to point out that an additional distinction must be made between those "assets" transitory in nature which derive from operating revenues and are turned over daily, and those income producing assets in more durable form which tend to be held for long periods of time. Secured parties are not seriously injured by the daily turnover of unmortgaged assets in the first category, even though technically there is less unmortgaged property available to support the Government lien each time money is spent for operating expenses. Only when assets in the durable category are involved might the se-

cured parties have a legitimate interest in preventing use of proceeds for operating expenses or for additions and betterments.[4]

The real estate properties involved in Orders 1073, 1103, and 1156 are clearly in the second category and thus require findings if, as, and when the reorganization court orders the use of the proceeds for operating expenses or for additions and betterments. I have more difficulty with the securities held in the Contingent Compensation Reserve Fund, however, since the Fund has many of the characteristics of ready cash retained for convenience in the form of securities. On balance, however, I agree with the majority that the securities in question were assets in the second category requiring findings. The Fund was clearly set aside as a reserve for certain specific expenses which would arise in the future, even though the company was not ultimately obliged to use the Fund for that purpose. I do not desire to penalize the company for its sagacity and vision in voluntarily maintaining such a Fund. It must be recognized, however, that in this case the company desires to use the Fund for a purpose which was far different than the one for which it was maintained and which would exhaust the Fund at a far earlier period in time Moreover, these were not assets used in the day to day operation of the railroad. I believe that at least in this situation the Fund should not be treated as a simple bank account, and that *Third Avenue* findings are required.

3. The statutory requirement is that the Trustees' Certificates be "treated as an expense of administration and receive the highest lien on the railroad's property and priority in payment under the Bankruptcy Act." 45 U.S.C. § 662(c).

4. The point I make in this section is distinct from the point made in Part I. There, the question was whether the secured parties were to be treated as having an interest of secured or unsecured creditors in the unmortgaged property being sold, with findings

required only in the former case. Here, the question is, even assuming the property in question is to be treated as mortgaged property (i. e., findings are generally required), whether findings are to be required for all expenditures whatsoever. If this is answered in the affirmative, a finding that the secured parties are to have the protection of *Jersey Central* and *Third Avenue* is equivalent to a prohibition on the spending of any money at all for operating expenses, and therefore a requirement of immediate liquidation.