**In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.**

**In re REPAIR OF the OLD SAYBROOK BRIDGE.**

**No. Bky. 70–347.**

United States District Court, E. D. Pennsylvania.

Dec. 4, 1974.

Donald A. Brinkworth, Philadelphia, Pa., for the Trustees, PCTC.

Morris Raker, Sullivan & Worcester, Boston, Mass., Spencer Ervin, Jr., Wilbur Bourne Ruthrauff, Gratz, Tate, Spiegel, Ervin & Ruthrauff, Philadelphia, Pa., for Richard Joyce Smith, trustee, New York, New Haven & Hartford R.R. Co.

Jerome E. Sharfman, Washington, D. C., for the USA.

Donald G. Avery, Cincinnati, Ohio, for Amtrak.

Frederic L. Ballard, Philadelphia, Pa., for Institutional Investors and Girard Trust Bank, indenture trustee.

## MEMORANDUM IN SUPPORT OF ORDER NO. 1726

FULLAM, District Judge.

On December 2, 1974, I entered Order No. 1726 in these proceedings, granting approval of the proposal of the Trustees to repair and improve the Old Saybrook Bridge, and to obtain reimbursement for the cost thereof, estimated at approximately $2.2 million, from National Rail Passenger Corporation ("Amtrak"). This Memorandum is being filed in order to amplify the reasons for entering that Order.

At some risk of over-simplification, the circumstances giving rise to the present controversy may be summarized as follows: The Old Saybrook Bridge is a drawbridge, which carries the tracks of the Debtor across the Connecticut River. When the drawbridge is up, rail traffic cannot cross the river. When the drawbridge is down, water traffic cannot use the river. But structural deterioration has reached the point that raising and lowering the bridge is becoming increasingly risky, and may soon become impossible.

Under its contract with Amtrak, the Debtor is required to maintain rail facilities used by Amtrak so that they are capable of handling traffic at the levels which existed as of May 1, 1971. Amtrak has the right to cause the Debtor, at Amtrak's expense, to improve the properties beyond their May 1, 1971 levels. There is room for a great deal of dispute and uncertainty as to how much of the deterioration of the Old Saybrook Bridge may have occurred since May 1, 1971. The present record does not permit accurate determination of that issue. However, it seems to be generally agreed that at least some of

the critical deterioration has occurred in recent years, partially in consequence of Tropical Storm Agnes which occurred in June 1972. And it also seems to be generally agreed that the structural repairs now contemplated would produce a bridge somewhat better, in terms of traffic-carrying capability, than existed as of May 1, 1971.

In theory, one solution to the problem would be to have Amtrak bear part of the cost of the present improvement (the "excess" over the 1971 structure), and to have the Trustees bear the remainder of the cost (that which is necessary to restore the bridge to its May 1, 1971 level). If this solution were adopted, then, in the event of an ultimate conveyance of the bridge to Conrail or some other entity, for a consideration, Amtrak would presumably be entitled to some limited participation in the distribution of the consideration, to the extent that the price paid reflected enhancement of the value of the bridge above its May 1, 1971 value.

But there are at least two obstacles preventing adoption of the solution discussed above. In the first place, allocation on the basis of the May 1, 1971 date would be complicated and conjectural. In the second place, and more importantly the Trustees do not have the cash to enable them to bear any significant portion of the present cost.

The Trustees have therefore negotiated an arrangement with Amtrak, pursuant to which Amtrak will bear the entire cost of the repairs and improvements. In the event of an ultimate conveyance of the bridge to Conrail or some similar entity, for consideration, Amtrak will be entitled to receive a portion of the consideration (not to exceed the cost now incurred), but only to the extent that the consideration reflects enhancement of the value of the bridge by reason of the present improvements. While this proposal would not eliminate the valuation difficulties suggested above, it would somewhat reduce them, by removing the problem of attempting to determine how much of the deterioration now being remedied antedates May 1, 1971. And, of course, it would provide the necessary cash.

■ The principal objections to the transaction have been presented by the New Haven Trustee, whose mortgage is a lien upon the bridge. One objection is that the transaction is essentially a loan from Amtrak to the Trustees for the purpose of restoring the bridge, and cannot validly be authorized in the absence of findings akin to those discussed in Central Railroad Co. of New Jersey v. Manufacturers Hanover Trust Co., 421 F.2d 604 (3d Cir. 1970) and In re Penn Central Transportation Company ("Columbus Option" case), 494 F.2d 270 (3d Cir. 1974). This argument is without merit. The transaction cannot be viewed as a loan, because the Trustees are incurring no obligation to repay. Amtrak has no claim against the estate unless the bridge is sold; even then, its claim is limited to any increase in the price which resulted from the present improvements. The calculation of this distribution, if it should occur, would seem to be virtually unrelated to the amounts now to be paid by Amtrak.

In short, since Amtrak's potential recovery is limited to the amount by which the consideration actually realized by the Debtor's estate is enhanced by reason of Amtrak's present contributions (and can in no event exceed the amount now to be paid in behalf of the estate), the secured creditors have no cause for complaint, and there is no necessity for findings as to the imminent prospect of successful reorganization.

■ For similar reasons, I reject a related argument advanced by the New Haven Trustee, namely, that it is unfair to subject this particular lienholder to the designation of its liened property as the source for possible reimbursement for additions and betterments,

when other lienholders have had their security enhanced through additions and betterments paid for out of operating funds of the Debtor. I do not believe improvements paid for by someone other than the Debtor's estate should necessarily be treated for all purposes as identical to improvements paid for with the Debtor's funds. It should also be noted that the record does not establish whether properties securing the New Haven mortgage have received more, or less, in the way of additions and betterments than properties securing other liens. And, while the matter has not been briefed or argued, I am inclined to believe that the holders of the various liens upon the Debtor's rail system can properly be required to let the chips fall where they may, in the matter of repairs and improvements, at least with respect to expenditures which are necessary for the continued operation of the railroad.

Be that as it may, it seems obvious that the sharp diminution in value which would inevitably result if the bridge were not repaired at all would affect the New Haven interests more severely than other lienholders. The New Haven Trustee therefore cannot persuasively argue in opposition to a transaction designed to prevent such diminution in value.

Other objections expressed at the hearing have, I believe, been obviated by the actual provisions of Order No. 1726. It is made clear in the Order that this transaction is not to constitute a precedent for other transactions involving the Northeast Corridor properties. And the jurisdiction of this Court to review the decisions of arbitrators pursuant to the agreement has been preserved "to the extent required by law," a provision which is intended to be consistent with the sound exercise of the discretion imposed in the reorganization court, and to insure that the valuation approaches which may be adopted by arbitrators can, if necessary, be made compatible with the treatment of valuation issues by other tribunals, and as applied to other properties of the estate.

## ORDER NO. 1726

And now, this 2nd day of December, 1974, upon consideration of the "Petition of Trustees for Authority to Repair the Old Saybrook Bridge", and after hearing thereon duly noticed, the Court being satisfied that repair of the Old Saybrook Bridge is necessary, and that its repair upon the terms and conditions proposed would contribute to increased safety of operations, it is ordered:

1. Trustees are authorized to execute an Agreement with Standard Engineering Corporation of Albany, New York for the repair of Old Saybrook Bridge.

2. Trustees are authorized to execute an Agreement with the National Railroad Passenger Corporation (Amtrak) providing for reimbursement to the Trustees for payments made to Standard Engineering Corporation and for other expenses incurred by Penn Central Transportation Company in the repair of the Old Saybrook Bridge, provided, however: (a) that the Agreement with Amtrak shall not constitute a precedent for any other transactions involving improvements to structures or other properties constituting the Northeast Corridor; and (b) that if the Old Saybrook Bridge structure, roadbed and related facilities, or any portion thereof are subsequently acquired by Conrail, Amtrak or any other person for use as a railroad, that portion of the consideration received by Penn Central for said properties and transferred to Amtrak pursuant to the said Agreement as justly and equitably attributable to the increase in the value thereof arising from these repairs, shall not exceed the total amounts paid by Amtrak for these repairs; and (c) in the event that during the course of these proceedings any matter is submitted to arbitration pursuant to an arbitration provision contained in the Agreement or any other Agreement entered into by the Trustees

incident to the implementation of that Agreement this Court reserves jurisdiction to review and approve, but only to the extent that the reservation and exercise of such jurisdiction are required by law, any arbitration decision or award before the same shall become final and binding upon the Trustees.