### In the Matter of LEHIGH VALLEY RAILROAD COMPANY, Debtor.

### In re Proceedings for the REORGANIZATION OF A RAILROAD.

No. 70-432.

United States District Court, E. D. Pennsylvania.

July 24, 1974.

Duane, Morris & Heckscher, by Williamson P. Donald, Philadelphia, Pa., for trustees, Lehigh Valley RR. Co.

Fox, Rothschild, O'Brien & Frankel by Howard R. Flaxman, Philadelphia, Pa., for First National City Bank of N. Y.

Ballard, Spahr, Andrews & Ingersoll by Richard L. Sherman, and Oliver C. Viddle, Philadelphia, Pa., for Girard Trust Bank and Chemical Bank.

Cravath, Swaine & Moore by Alan C. Stephenson, New York City, for Chemical Bank.

### MEMORANDUM AND ORDER NO. 259

FULLAM, District Judge.

On March 2, 1973, the Trustees of the Debtor filed a petition (Document No. 525) seeking approval of a proposed sale of 34.34 acres of land in Buffalo, New York (together with former passenger station waiting room, two-story office building, freight house and meat platform thereon) for a cash price of $750,000. A hearing on that petition was held on March 23, 1973, and the transaction was approved, by Order No. 164.

In the petition, and at the hearing, it was made clear that one of the terms of the sale was a requirement that the Trustees vacate the premises within eight months, and that this would involve relocation of various personnel working on the property to other locations, and the removal of certain facili-

ties therefrom. The Trustees estimated that these "relocation expenses" might cost as much as $250,000. It was alleged in the petition that the Trustees regarded these relocation costs as an expense directly attributable to the sale, and that they would seek reimbursement from the proceeds.

At the hearing, certain Indenture Trustees holding liens upon the property objected to any allowance of relocation expenses from the sale proceeds. The Trustees asserted that they were not seeking authorization at that time to use any part of the sale proceeds for these relocation expenses, but merely wished to make their position clear, so that if and when such expenses were actually incurred, they would be free to seek reimbursement from the sale proceeds, and the Indenture Trustees would remain free to object to such reimbursement. It was pointed out that the Trustees had filed a petition seeking leave to terminate rail operations, and that the actual amount of any relocation expenses might well depend, to a substantial extent, upon whether or not the Trustees would be continuing to operate the railroad. Paragraph 4 of Order No. 164 expressly preserved the right of the Trustees to seek reimbursement for relocation expenses from the proceeds of the sale.

On July 2, 1974, the Trustees filed a petition (Document No. 1192) setting forth the facts that settlement for the Buffalo property has now been consummated, and that net proceeds in the sum of $744,324.52 have been deposited in escrow pursuant to Order No. 26 in these proceedings; that they have incurred relocation expenses totaling $69,115 in order to deliver possession of the property pursuant to the agreement of sale; that they regard these expenses as directly related to the sale itself, and therefore seek reimbursement in that amount from the escrowed proceeds. A hearing on this petition was held on July 19, 1974.

The Indenture Trustees object to the present petition. Initially, they contend that it was their understanding that the Trustees would first seek approval of this Court, after hearing, before expending any sums for relocation, and that they have been deprived of an opportunity to object to such expenditures. There is no merit to this contention. The previous Order contemplated that the Trustees could seek either advance approval or reimbursement for such expenses. In their present petition, the Trustees are seeking approval of the expenditures, as well as authorization to be reimbursed from the escrowed proceeds. In short, the present hearing provided an opportunity to the Indenture Trustees to set forth any objections they might have to the actual expenditures themselves. No such objections were expressed, and it seems clear on the record that all of the expenditures were justified.

The main thrust of the Indenture Trustees' objection goes to the use of proceeds from the sale to pay for the relocation expenses. The Indenture Trustees insist that approval of any such reimbursement would be equivalent to authorizing the use of secured assets to meet operating expenses, and would be impermissible under the stringent tests most recently reviewed in the recent "Columbus Option" decision of the Third Circuit, In re Penn Central Transportation Co., 494 F.2d 270 (1974).

This characterization of the present proposal is the product of essentially the following line of reasoning: The Indenture Trustees held liens upon the Buffalo property. As the result of the sale of that property, net proceeds in the sum of $744,324.52 were deposited in escrow, and the liens transferred to that fund. Therefore, the Indenture Trustees now have liens upon $744,242.52. The relocation expenses were incurred in order to enable the railroad to continue in operation. The use of any part of the $744,242.52 to meet the expenses of such operations would mean the use of secured assets to meet operating expenses.

If the initial premise were sound, the Indenture Trustees' argument would be persuasive indeed. But the real issue, which was expressly reserved for later decision when the sale was originally approved, is whether the Indenture Trustees are entitled to recognition of their lien as to the full sum of $744,324.52. In other words, the Court is now required to determine how much of the escrowed sum truly represents "net proceeds" from the sale of the liened property, and how much of it should be attributable to the costs of sale.

The Trustees of the Debtor point out that the arrangement with the purchaser necessitated these expenditures; the sale could not have been consummated unless the Trustees were willing to incur the expenses, and the estimated amount of these costs was taken into account in negotiating the sale price. From their point of view, all of the relocation expenditures were necessary in order to make it possible to sell the Buffalo property at all. The Indenture Trustees, on the other hand, argue that a substantial part of the relocation expenses would not have been necessary merely to sell the property at Buffalo, but rather were necessary in order to enable the Trustees to continue to operate the railroad at other locations. I am persuaded that both sets of assertions are valid. The expenditures were necessary in order to enable an operating railroad to sell the property at Buffalo and continue to be an operating railroad. Does this make the expenditures operating expenses, or expenses of sale?

At this point, I believe certain practical aspects of the situation must be recognized. The Trustees were operating a railroad. They had an opportunity to sell property which was not being fully utilized, and which could be rendered surplus by some relatively minor relocations. They had no immediate prospect of being relieved from their common carrier responsibilities. They had in their files a 1972 appraisal of the property, as of June 30, 1971, showing a maximum value of approximately $633,000 for transportation purposes, and a liquidation value of $624,000. They rejected earlier offers [1] from this same purchaser in the amounts of $650,000 and $715,000, because those prices would not adequately cover the expense and trouble of relocation. Eventually, the Trustees agreed to accept an offer of $750,000. If the reimbursement now sought is permitted, the Indenture Trustees will have a lien upon escrowed cash substantially in excess of the appraised value of the property for any purpose, and a further lien on approximately $22,000 worth of salvaged materials useable on other portions of the railroad covered by their liens.

While it is undoubtedly correct that lien values may not be reduced in order to meet operating expenses (in the absence of special circumstances not shown here) the general creditors and other creditors of the estate cannot be required to permit their property rights to be invaded in order to enhance the salability of liened property.

The basic defect in the Indenture Trustees' argument is the assumption that $750,000 must represent the fair market value of the property, and thus the value of their lien rights in it. The record does not support that assumption. I am satisfied that the net liquidation value of the property in question did not exceed $630,000, and its fair market value for any purpose did not exceed $650,000, as of the time of sale. The fact that the purchaser was willing to pay an additional amount toward relocation expenses, and that these expenses were less than originally estimated, should not inure solely to the benefit of the secured creditors represented by the Indenture Trustees, to the detriment of the general estate. Permitting the Indenture Trustees a lien on escrowed cash totalling $675,209.52, plus salvage of about $22,000, leaves

1. These offers were for 41.54 acres; the approved transaction includes only 34.34 acres.

them in a far better position than they occupied before the sale, gives full recognition to their rights, and reflects an accurate and equitable allocation of the expenses of the sale. The Trustees' petition will be granted.

ORDER NO. 259

And now, this 24th day of July, 1974, upon consideration of the Petition of the Trustees for Reimbursement of Relocation Expenses Incident to the Sale of Property in Buffalo, New York, and upon notice being duly given in accordance with the Order of Notice, it is Ordered that:

1. Philadelphia National Bank is hereby authorized and directed to pay to the Trustees of Debtor, upon demand, the sum of $69,115.00 from the net proceeds deposited in the special account maintained therein pursuant to Order No. 26 in these proceedings, as reimbursement for necessary relocation expenses incident to the sale of the Buffalo, New York, property as described in the Petition for this Order.